**FEDERAL BROADCASTING SYSTEM, Inc., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**WHEC, Inc., Intervenor,**

**Veterans Broadcasting Company, Inc., Intervenor.**

No. 12252.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 2, 1955.

Decided July 28, 1955.

**562**

Mr. William A. Roberts, with whom Mr. E. D. Johnston, Mrs. Irene Kennedy and Mr. Julian P. Freret, Washington, D. C., were on the brief, for appellant. Mr. Morton R. Galane, Washington, D. C., entered an appearance for appellant.

Mr. Warren E. Baker, Gen. Counsel, Federal Communications Commission, with whom Messrs. J. Smith Henley, Harrison, Ark., Asst. Gen. Counsel, Federal Communications Commission, Daniel R. Ohlbaum and Warren D. Quenstedt, Counsel, Federal Communications Commission, were on the brief, for appellee. Messrs. Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, and Stanley S. Neustadt, New York City, Counsel, Federal Communications Commission, also entered appearances for appellee.

Mr. Thomas H. Wall, with whom Messrs. Thomas W. Wilson, Jerome H. Heckman, Frank U. Fletcher and Frank Roberson were on the brief, for intervenors. Mr. Alfred C. Cordon, Jr., Washington, D. C., entered an appearance for intervenor WHEC, Inc.

Before PRETTYMAN, FAHY and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This case involves a protest against the grant of a television permit (license) for Channel 10 in Rochester, New York, to the intervenors WHEC, Inc. (WHEC) and Veterans Broadcasting Co., Inc. (Veterans). The principal questions raised are whether the Commission's accelerated procedures were valid, and whether it acted properly in dismissing a protest for lack of specificity.

In 1952 WHEC and Veterans filed mutually-exclusive applications for the Channel 10 television license in Rochester. These applications were due to be heard on a competitive basis. In early March of 1953, however, WHEC and Veterans entered into a share-time agreement for the use of Channel 10 and thus resolved the conflict between their applications. On March 4 and 5, 1953, respectively, they amended their applications accordingly. On March 9, 1953, the Commission accepted the amendments for filing and gave public notice of its action. At its next meeting on March 11, 1953, the Commission granted intervenors the Channel 10 television permit for share-time operation.

Federal Broadcasting System, Inc. (Federal), protestant before the Commission and appellant here, is the licensee of standard broadcasting station WSAY in Rochester, New York. At the time when the above-described proceedings in regard to the Rochester Channel 10 television license took place, it was not an applicant for that license. Appellant tells us that it had intended to file an application for the Channel 10 license, but had been prevented from completing its technical data by difficulty in obtaining a suitable antenna site. Six days after the Commission's grant to the intervenors, Federal filed its application for Channel 10. Simultaneously it filed a protest, under Section 309(c) of the Federal Communications Act, 47 U.S.C.A. § 309(c), against the grant to intervenors.

Acting on Federal's protest the Commission suspended the intervenors' permit and set Federal's protest for hearing on issues to be framed by subsequent order. The intervenors objected to the protest on the ground that Federal was not a "party in interest" and had not

specified "with particularity the facts, matters and things relied upon." On July 27, 1953, the Commission reversed itself and dismissed the protest on the latter ground. It also returned Federal's application for a television license on Channel 10.

On August 18, 1953, Federal filed a petition for reconsideration, relying on newly-found facts relative to the alleged invalidity of the Commission proceedings of March 11, 1953.

On May 3, 1954, Federal's petition for reconsideration was denied both on the ground that the Commission could not act on facts presented after the expiration of the 30-day period allowed for filing a protest under 47 U.S.C.A. § 309 (c), and that the facts set forth in Federal's petition for reconsideration, if considered on the merits, did not constitute a reason for reinstating Federal's protest. This appeal followed.

### I.

The primary issue before us is, of course, whether the Commission erred in its treatment of Federal's protest against the grant made.

Section 309(c), under which the protest was filed, was added to the Act by the 1952 revisions. It was an expression of Congressional desire to guarantee interested parties an opportunity to be heard where Commission action was taken without a prior opportunity for voicing opposition. This was an innovation. However, in thus opening the door to protestants, Congress required that the protest *"shall specify with particularity the facts, matters, and things relied upon, but shall not include issues or allegations phrased generally."* (Italics added.) 47 U.S.C.A. § 309(c). It

was this requirement that the Commission held was not satisfied by Federal's protest.[1]

It is clear from a reading of the statute and its history that Congress sought to require one protesting a unilateral grant of a license by the Commission to show in some detail the factual basis of his grievances.[2] Generalized objections are obviously insufficient under the statute without some specification of events and circumstances. But neither are we to measure the requirement of Section 309(c) by the technicalities of pleading formerly applicable in civil litigation. What is required is merely an articulated statement of some fact or situation[3] which would tend to show, if established at a hearing, that the grant of the license contravened public interest, convenience and necessity, or that the licensee was technically or financially unqualified, contrary to the Commission's initial finding.

Read in that light it seems clear to us that appellant's protest raises at least one issue with sufficient particularity to require that a hearing on the protest be granted. That is the issue of threatened monopoly control of mass media of communications in the Rochester area. The protest in that regard avers that the intervenor WHEC is a subsidiary of the Gannett Newspaper chain which has a monopoly of the daily newspapers in the City of Rochester, owns other standard broadcasting stations both in Rochester and elsewhere and controls numerous newspapers outside Rochester. A list of Gannett enterprises is set forth as part of the protest, showing the extent of the Gannett radio and newspaper chain in upstate New York, which includes the Rochester area.[4] Appellant

---

1. The Commission held, and we think properly, that Federal was a "party in interest" entitled to file a protest.

2. "Provisions also are included which are designed to guarantee that any hearings held before the Commission upon any application will be conducted upon the basis of issues clearly defined so that the Commission will act as an arbiter." S.Rep. No. 44, 82d Cong., 1st Sess., p. 8 (1951).

3. Compare Christianson v. Gaines, 1949, 85 U.S.App.D.C. 15, 174 F.2d 534; Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236; Fleming v. Dierks Lumber & Coal Co., D.C.W.D.Ark.1941, 39 F.Supp. 237.

4. This list actually is Appendix A to appellant's reply to the motion to strike the protest made by intervenors. This document was received by the Commis-

further asserts that the Gannett newspapers, "obviously" because of their ownership of Station WHEC, have treated appellant's Station WSAY unfairly in regard to publicity coverage of the latter's radio programs and thus have caused it financial loss beyond what would have been the result of ordinary competition between the two radio stations. Federal also stated that the newspaper chain operating WHEC engages in broadcasting "as a business activity secondary to their principal business, the publishing of newspapers."

In our view, these allegations clearly "specify with particularity the facts, matters, and things relied upon," and the Commission erred in holding the contrary. Nor can it be said that the issue so raised is frivolous or immaterial. On the contrary, this court's recent decision in Clarksburg Publishing Co. v. Federal Communications Commission, 1955, 96 U.S.App.D.C. ——, 225 F.2d 511, shows its importance. And the fact that Federal raises the issue as part of its effort to show its own comparative superiority does not diminish the public interest involved in the matter.

Federal's protest went further than to raise the issue just mentioned. It went on to say that (1) Federal was surprised by the sudden action of the Commission in granting the WHEC and Veterans license; it could not have anticipated such action because up to March 4, 1953, the application of the grantees had been mutually exclusive: in consequence, the Commission should waive its rules with regard to the filing of applications prior to action by the Commission, and allow Federal's application to be filed as an application mutually exclusive with that of WHEC and Veterans. Federal alleges that the Commission acted too speedily in making the protested grant and acted under internal proceedings unknown to

Federal or to the public and without reasonable notice of the change in the status of the applications of WHEC and Veterans. (2) The operation of both stations through a joint transmitting plant involves legal and practical questions which were never fully considered by the Commission. Use of a television station by one operator gives, Federal says, superior service. Federal also predicts that intervenor WHEC will buy out the interest of the other intervenor Veterans in the proposed joint television station, though furnishing no facts to sustain this allegation. (3) Federal "doubts" that the financial qualifications of Veterans could withstand the careful scrutiny to which they would be subjected at a competitive hearing, and asserts that "the commercial policies by which they conduct [standard broadcasting station] WVET accord neither with accepted practice nor the commitments made as an applicant"; that Veterans has had "financial difficulties in which one of the Rochester banks became involved to the extent of $100,000 or more" and that the bank brought pressure on merchants to advertise with WVET; and that other "commercial tactics of WVET have been of such a character that petitioner prefers to operate unprofitably rather than to degrade its programs through adoption of such questionable practices." [5]

■■ We need not here consider whether each of these additional allegations, taken separately, is stated with sufficient particularity. For, as we said in Clarksburg, once a protestant—as here —has shown sufficient grounds to require the holding of the hearing prescribed by Section 309(c) of the Act, the Commission is free to consider any issue bearing on the qualifications of the licensee or the required finding of public interest, convenience and necessity; it is not limited to issues raised by the protestant. In

sion April 1, 1953, within the 30-day protest period set by Section 309(c) and running from March 12, 1953. Factual matter contained in such a document can clearly be considered as part of the protest in evaluating compliance of the

protest with the particularity requirement of the same section.

5. These last two allegations appear in Federal's reply to the motion to strike its protest. See note 4, supra.

the present case the Commission should not conclude its hearing until it has built up a record sufficient to support its final conclusions. The speed with which it made its grant to the intervenors seems to us to require that it now act with particular care in its re-examination of the matter. That re-examination should include an appraisal of the arrangement for joint operation by the intervenors, with reference not only to its effect on programming but also to the circumstances surrounding the amendment of the original applications and the initiation of the joint project. See Clarksburg, supra.

## II.

For the reasons given, we think that a broad reopening of the case is called for by appellant's protest. The question remains: at the forthcoming proceeding, is the Commission bound to give appellant a comparative hearing on its application? Appellant asks us to answer this question in the affirmative.

■ It is clear, of course, that the protest procedure is not, as such, designed to develop comparative considerations. It is one designed to vindicate the public interest through an examination of alleged defects in the outstanding grant. Here, if the Commission ultimately sets aside the grant to the intervenors, after holding a hearing on the protest, it will be open to appellant to file an application which will be entitled to consideration along with any other for the same channel. But appellant goes farther: it argues that it is presently entitled to a comparative hearing. Its position, in essence, is that the Commission's grant of a license to the intervenors is completely lacking in validity or effect: in its view, the channel is still open for assignment.

■ Appellant first contends that the Commission's grant to intervenors is invalid, as not being based on the votes of a majority of the Commission. The

minute of the Commission's March 11 meeting shows that Commissioner Hennock objected to the entire procedure there followed, because she felt that it failed to safeguard the interests of the public and of other prospective bona fide applicants who were given no notice of the sudden acceleration of the Commission's normal processing activities. (J.A. 134–5) When the Rochester applications were reached, Commissioner Merrill asked that they be passed over for his further study. The majority of the Commissioners did not accede to his request, although Commissioner Merrill stated that such a request had in the past always been respected. When the vote was taken on the grant of a license to the intervenors three Commissioners voted in favor of the application, two Commissioners voted to pass over and Commissioner Hennock did not participate. At a meeting of the Commission held on the following day a motion was made to reconsider the grant of the Rochester license application, but was defeated.[6]

Appellant here renews its argument before the Commission that we should construe the vote taken on the intervenors' applications for a license at the March 11, 1953, meeting of the Commission as a tie vote, counting Commissioner Hennock's absence as a negative vote in view of her dissent. However, the Commission's minute, duly approved by it and now urged upon us as valid by the Commission's counsel, shows a vote of three Commissioners in favor of the application, with two Commissioners opposed out of a total of five Commissioners voting, one Commissioner being absent when the vote on the Rochester application was taken. Nothing in law or fact authorizes us to reach any other conclusion than that the action in question was taken by majority vote of the Commissioners present and voting.

Secondly, appellant complains of the procedures by which the Rochester television applications were brought before

6. Federal excused its delay in presenting these facts as part of its original protest by its inability to secure, prior to August 1953, a copy of the minute of the Commission's March 11 meeting.

566

the Commission for action on March 11, 1953. It cannot point to any specific provision of the Commission's rules which was contravened. On the contrary, it concedes that Section 1.382(b) of the Rules required that an application, to be considered as mutually exclusive with applications already on file, must be filed not later than the close of business on the day preceding the day on which the Commission takes action with respect to applications previously filed. Appellant's application was not so filed. Further, there was no rule in effect barring the Commission from promptly considering applications which had become ripe for action, or compelling their consideration in any particular order.[7] But appellant argues that the Commission acted with undue speed, under procedures unknown to Federal or the public, and without reasonable notice of the change in status of the pending applications of WHEC and Veterans.

■ Were the procedural changes adopted by the Commission arbitrary in the sense that they cumulatively amounted to a violation of due process? To answer this question requires some consideration of the background against which the Commission's action was taken. Because of the overwhelming burden of processing and hearing contested television license applications the Commission, in May 1952, had temporarily discontinued the processing of these applications and had continued processing only those cases where a single applicant sought a license for a particular television channel. Since May 1952 numerous additional applications had become uncontested and, to dispose of them

as speedily as possible, the Commission decided on March 4, 1953, to place such applications on its agenda for March 11, 1953. Including the Rochester applications, 48 applications in this class were slated for action on March 11. The Commission also decided to proceed on March 11 without the written presentation normally foreseen by its rules [8] and to act on oral staff statements as to the qualifications of the applicants. Since the Commission considered that these applications did not require a comparative hearing any more than applications at all times uncontested, it decided on March 4, 1953, to make a dent in this part of its backlog by the procedure outlined.

Insofar as the choice of this method involved internal procedural changes the Commission under Section 4(i) and Section 4(j) of the Act [9] had the power to issue such orders as were necessary in the exercise of its duties and to conduct its business in such manner as would best serve both proper dispatch of business and the ends of justice. We cannot say that the Commission's deviation from its usual procedure, and grants made thereunder, exceeded its powers. Cf. Norris & Hirshberg v. Securities and Exchange Commission, 1947, 82 U.S.App.D.C. 32, 163 F.2d 689; Morgan v. United States, 1938, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129; Bethlehem Steel Co. v. N. L. R. B., 1941, 74 App.D.C. 52, 120 F.2d 641.

After a short period of experimentation and consideration, this additional procedure for dealing with uncontested applications was formally approved by the Commission and the step from *ad hoc* action to general rule making taken.[10]

---

7. In fact, the Commission had already decided to take up these applications at its next meeting.

8. The Commission's rule, 47 C.F.R. § 1.-372 (1953), obviously contemplates, though it does not expressly prescribe, the preparation of such reports *in writing*. Appellant here complains, *inter alia*, of the omission of written reports.

9. 47 U.S.C.A. § 154(i) and (j), providing in relevant part as follows:

"(i) The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

"(j) The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. * * *"

10. See FCC Order 53–627 amending subparagraph (m) of footnote 10 of Section

Certainly such a matter was primarily within the Commission's "informed discretion," Securities and Exchange Commission v. Chenery Corp., 1947, 332 U.S. 194, 203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995, and is not open to the broad challenge made by appellant here.

But to recognize the primary role of the Commission in governing its own procedures does not mean that we are oblivious of the dangers of accelerated procedures which might sacrifice the careful performance of the Commission's substantive tasks to mere speed. See Clarksburg, supra. Speed of Commission action may in some cases point to a failure to make those essential findings which the agency must make under Section 309(a) of the Act[11] before it grants a requested license. And any perversion of the Commission's administrative processes for an improper purpose would call for administrative relief or, if that is not granted, for judicial correction—presumably injunctive in nature. But no such situation is here alleged. In this court appellant states that it had intended to file an application for a television license but had been prevented from completing its technical data because of difficulty in obtaining a suitable antenna site. The Commission was hardly compelled to wait for the resolution of this obstacle, even assuming that it knew of it.[12]

The cases relied on by appellant do not lead to a different conclusion. United States ex rel. Knauff v. McGrath, 2 Cir., 1950, 181 F.2d 839, dismissed as moot, Knauff v. McGrath, 1951, 340 U.S. 940, 71 S.Ct. 504, 95 L.Ed. 678, involved an administrative denial of a stay of deportation. It was deemed proven for purposes of decision on appeal that in all instances without exception such a stay was granted pending congressional action, once a bill had been offered. A judicial stay was, therefore, granted by the court. But no such situation is involved here. Here the exceptional treatment accorded to the Rochester applications was proposed to be granted to 47 other television applications, in an effort by the Commission to speed up the disposition of applications where a contest had ceased to exist. The Commission's approach to the problem of disposing of this backlog of uncontested television applications certainly cannot be considered as equivalent to a single arbitrary exception in the handling of pending applications. The Commission is not bound to adhere to a procedure just because it was once adopted. Cf. Churchill Tabernacle v. Federal Communications Commission, 1947, 81 U.S.App.D.C. 411, 160 F.2d 244.

United Detroit Theatres Corp. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 239, 178 F.2d 700, is even less applicable. It holds that a single application may not be arbitrarily held up. We found in that case that the need for certain investigations under Commission policies required that consideration of the application be postponed. In the instant case appellant had no application pending which was held up arbitrarily. The Rochester applications were processed with dispatch. Perhaps some other applicant could argue that taking up the Rochester applications ahead of others on the list caused prejudice to him. But appellant—not such an applicant—is not in a position to rely on this argument.

Nor does appellant's challenge to the Commission's procedure fare better insofar as it relies on Section 3(a) of the Administrative Procedure Act.[13] The

---

1.371, dated May 25, 1953, 18 Fed.Reg. 3068, as further amended by FCC Order 53–889, July 17, 1953, 18 Fed.Reg. 4378, and FCC Order 54–1305, Oct. 21, 1954, 19 Fed.Reg. 6881, substituting therefor § 1.378, 47 C.F.R. § 1.378.

11. 47 U.S.C.A. § 309(a).

12. In 1948, appellant's station WSAY wired the Commission protesting the refusal of station WHAM to share its television transmission site with WSAY. The matter was not pressed, and was certainly stale by 1953.

13. 5 U.S.C.A. § 1002(a):

only penalty provided in that section is that no person shall be required to resort to any agency procedure not duly published in the Federal Register. Appellant was not compelled to resort to procedure not published.

 We conclude, therefore, that the Commission's proceedings—whether or not subject to criticism—were not so infirm as to require departure from the well-established rule that a late-filing applicant is not entitled to a comparative hearing. KFAB Broadcasting Co. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 160, 177 F.2d 40; Telegraph Herald Co. v. Federal Radio Commission, 1933, 62 App.D.C. 240, 66 F.2d 220; cf. Yankee Network v. Federal Communications Commission, 1939, 71 App.D.C. 11, 107 F.2d 212.[14]

### III.

Appellant also urges on us as illegal the rejection of the petition for reconsideration on the ground that the Commission could not properly consider as part of a protest newly-discovered matter first set forth after the end of the 30-day period for filing a protest. Appellant claims that to the extent that the two applicable sections of the Federal Communications Act are in conflict, Section 405[15] supersedes the shorter limitation contained in Section 309(c), insofar as rehearings are concerned. We need not resolve this alleged conflict, since the

Commission's Order of May 3, 1954, denying reconsideration of Federal's protest, in fact gave full consideration to the new matter alleged by appellant. The question is thus moot.

Reversed and remanded for further proceedings consistent with this opinion.

"(a) Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its central and field organization including delegations by the agency of final authority and the established places at which, and methods whereby, the public may secure information or make submittals, or requests; (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopt-

ed by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law. No person shall in any manner be required to resort to organization or procedure not so published."

14. The Commission's practice conforms to this rule. T. E. Allen & Sons, Inc., 9 Pike & Fischer RR 197 (1953). Appellant relies on Western Air Lines, Inc., v. Civil Aeronautics Board, 9 Cir., 1952, 196 F.2d 933, and United Air Lines v. Civil Aeronautics Board, 7 Cir., 1952, 198 F.2d 100. But these cases involved proceedings for the suspension of one air carrier and substitution of another on an existing route, a situation which has no application to the instant appeal.

15. 47 U.S.C.A. § 405.