**COMMUNITY BROADCASTING CORPORATION, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Sunbeam Television Corp., Intervenor.**

**No. 19421.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 21, 1966.

Decided June 28, 1966.

---

718

Mr. John B. Kenkel, Washington, D. C., and Mr. William C. Lantaff, Miami, Fla., of the bar of the Supreme Court of

Florida, pro hac vice, by special leave of court, with whom Mr. Arthur H. Schroeder, Washington, D. C., was on the brief, for appellant.

Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, Federal Communications Commission, John H. Conlin, Associate General Counsel, and Joseph A. Marino, Counsel, Federal Communications Commission, were on the brief, for appellee. Mr. Robert B. Jacobi, Counsel, Federal Communications Commission, entered an appearance for appellee.

Mr. Alan Y. Naftalin, Washington, D. C., with whom Mr. Victor E. Ferrall, Jr., Washington, D. C., was on the brief, for intervenor.

Before DANAHER, WRIGHT and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal under the Communications Act, 47 U.S.C. § 402(b) (1), challenges the renewal by the Federal Communications Commission of the license of Sunbeam Television Corporation to operate a television station on Channel 7 in Miami, Florida. Appellant, Community Broadcasting Corporation, filed a mutually exclusive application for the license in question, necessitating a comparative hearing. The Examiner who conducted the hearing recommended renewal of Sunbeam's license, a result which was supported before the full Commission by its Broadcast Bureau. The Commission unanimously upheld the Examiner's recommendation. The principal issue described by us in this appeal relates to the scope of the Commission's discretion, in reckoning the licensee's broadcast experience, to take the fact of this licensee's operation of the station into account in a comparative hearing of its renewal application.[1] For the reasons appearing

---

1. In the Commission proceedings, and in its brief to us, appellant charged certain reporting delays on the part of Sunbeam which assertedly required the Commission either to disqualify Sunbeam or to give it an emphatic demerit. We, however, find no reason to reject the Commission's determination that these matters involved no purpose to evade or deceive. They grew out of the long period of time when Sunbeam was, due to the

hereinafter, we affirm the Commission's action.

## I

Sunbeam first applied for the license in 1953. Its application, together with those of three other applicants, was set for comparative hearing in 1954. Sunbeam was unsuccessful, but in 1959 the Commission reopened the record for further proceedings in which the Commission ultimately disqualified the other three applicants for misconduct in relation to the adjudicatory processes of the Commission. Biscayne Television Corp., 31 F.C.C. 237 (1961).[2] Since the Commission had earlier determined after hearing that Sunbeam was "legally, financially, and technically qualified to become a licensee of the Commission," it awarded the license to Sunbeam. This grant, although expressly unconditional in nature, was for a period of four months instead of the maximum permissible time of three years. The Commission characterized this action as permitting an early reexamination of Sunbeam's qualifications, particularly in relation to those of any new applicant or applicants who might come forward.

Sunbeam began operating the station on December 19, 1962. The following April 1 it filed its renewal application. On June 12, 1963, Community applied for the same license. The comparative hearing ordered by the Commission was held in January, 1964; and the Examiner's Initial Decision in favor of Sunbeam was issued July 30, 1964. In affirming this decision, the Commission regarded the two competitors as on even terms except in three relevant categories. These were area familiarity, integration of ownership and management, and broadcast experience. In respect of the first, a slight preference was accorded Community. A much stronger and overbalancing preference was believed by the Commission to be due Sunbeam in the matter of ownership-management integration. With respect to broadcast experience, the Commission noted that none of the people involved in Community had television operating experience. It pointed out that, in contrast, three of Sunbeam's stockholders (not including the lawyer referred to in Note 1, *supra*), holding a majority of its stock, had experience "in meeting the day-to-day operational problems of the very facility under consideration"; and, in summing up its weighing of Community's preference for area familiarity against Sunbeam's for ownership-management integration, the Commission remarked that area familiarity had less significance in a situation where, as here, 51 percent of Sunbeam's stock was held by three "long-term local residents who have acquired an insight into the programming needs

machinations of its original competitors for the license, an unsuccessful applicant. The Commission thought it not surprising that this 10-year delay should see some changes in the constitution of Sunbeam's investing group. These were all voluntarily reported, and Sunbeam was guilty at most of some tardiness which it was for the Commission to assess in relation to Sunbeam's character qualifications. See FCC v. WOKO, Inc., 329 U.S. 223, 229, 67 S.Ct. 213, 91 L.Ed. 204 (1946); KIDD v. FCC, 112 U.S.App.D.C. 288, 289, 302 F.2d 873, 874 (1962).

Just prior to oral argument of this appeal before us, appellant filed a motion to remand the case to the Commission. The basis for the motion was that a Miami lawyer who is a director and 10% stockholder of Sunbeam had been indicted for mail fraud. But it clearly appears that the subject matter of this indictment is wholly unrelated to Sunbeam, and that the lawyer in question has stepped out as a director and sold his stock on terms which assure that he can resume his connection with Sunbeam only if he is cleared of the charges against him. Under these circumstances, and especially in view of the long delay to which Sunbeam has, through no fault of its own, been exposed in its quest for a license, we think a remand is not necessary. The motion is, accordingly, denied.

2. These proceedings reached this court three times, and were the subject of one opinion and two orders. Sunbeam Television Corp. v. FCC, 100 U.S.App.D.C. 82, 243 F.2d 26 (1957); Nos. 13180 and 14401, order approving further proceedings by the Commission entered May 13, 1959; No. 14401, dismissed by order entered June 4, 1962.

of the service area through the actual operation therein of a television facility," and whose "knowledge and experience will contribute substantially to Sunbeam's ability to provide a programming service in the public interest on a continuing basis." The Commission's conclusion was that "[I]n view of the foregoing, we find that greater assurance of effectuation of proposals is provided by Sunbeam's superiority in integration of ownership and management and in broadcast experience than by the slight preference in area familiarity accorded Community." [3]

Community urges upon us that these references by the Commission to Sunbeam's broadcast experience deprive the comparative hearing of the essential quality of fairness. See Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). For purposes of this argument, it is not necessary to differentiate between the four months of Sunbeam's operations pursuant to the precise terms of its license, on the one hand, and the so-called hold-over period which continued until the resolution of the competing applications.[4] If the argument is valid, it applies to the former period as well as to the latter. Community also urges, however, that, even if the Commission may properly take the first into account, the assigning of any weight to the hold-over period is contrary to the Commission's own Rules. We consider these contentions in that order.

## II

Community's first line of attack under *Ashbacker* is that Sunbeam possessed, in legal contemplation, no more than a temporary grant of interim operating authority pending the completion of the comparative hearing, and was not, therefore, a true licensee seeking renewal. This, so it is said, is the construction to be placed upon the Commission's limitation of Sunbeam's license to four months as distinct from the longer period available under the statute.

This is not, however, the construction which the Commission placed upon its own action when it took it. It then said in so many words that Sunbeam had, after hearing, been found to be a fully qualified applicant in all respects, and it awarded the license to it unconditionally—an award which, conceivably, Sunbeam might have received several years earlier had it not been for the *sub rosa* assaults upon the Commission's integrity by the three competing applicants. Any major television channel in Miami, Florida, is a vital facility in terms of the public interest. The Commission was, therefore, free to decide as a matter of policy that it was desirable for Sunbeam to face some honest competition without waiting three years; and there is, of course, nothing in the statute which prescribes that an initial grant shall be for one, twelve, or thirty-six months. For the period of the grant, whatever it may be, the licensee who has been found qualified is like any other, except in the knowledge that renewal must be accomplished at an earlier date.

In any event, the construction of Sunbeam's status pressed by Community has been rejected in the case of another licensee who received a four-months' grant under similar circumstances. South Florida Television Corp. v. FCC, 121 U.S.App.D.C. 293, 349 F.2d 971 (1965), cert. denied, 382 U.S. 987, 86

---

3. The Commission expressly noted that its decision did not entail any preference to Sunbeam for its past broadcast performance record, although it commented that Sunbeam "had demonstrated an awareness of, and responsiveness to, the programming needs of the area * * *."

4. Although the hold-over period does not end with the closing of the record in the comparative hearing, Community's complaint in this case is directed against

the 12 months of operation by Sunbeam which had elapsed when the hearing ended. This 12 months is comprised of the four months specified in the license, and the eight months which followed. It seems to us relevant to the concept of fairness as between Sunbeam and Community to note that the first 60 days of the hold-over period was the period prescribed by the Commission as the filing period for new applicants.

S.Ct. 541, 15 L.Ed.2d 541 (1966). In that case this court held that it was not improper for the Commission to have given the renewal applicant the status of a true licensee;[5] and it addressed itself in terms to the question of whether the giving by the Commission of a credit for broadcast *performance* to the four months' licensee rendered the comparative hearing unfair *vis-a-vis* the new applicants. The court purported to regard the credit as "minor in nature," and characterized it as not having figured directly in the three principal categories for which the licensee was given a decisive preference, *i. e.*, broadcast experience, ownership-management integration, and area familiarity.[6]

In the case presently before us, the Commission gave Sunbeam no credit for broadcast *performance*, as distinct from broadcast *experience*, and in this respect it could reasonably be maintained that *South Florida* has an *a fortiori* impact on our disposition of this appeal. Where a qualified applicant for a license has been compelled, by the moral shortcomings of his original competitors and of public servants themselves, to spend 10 years in the quest, it is perhaps not arbitrary to suggest that, as against the new applicants who have been spared that frustrating and expensive experience, the Commission may take note of the fact—for it is nothing more—that the four-months licensee has actually been operating the station.

New applicants are, of course, free to seek the license at renewal time under our national policy of hoping at least that these enormously important public facilities are always in the best hands. But are these newcomers upon the scene, at least in the special circumstances shown by this record, entitled to claim that the Commission may not even take note of the fact that the licensee has been operating the station and has at least that much broadcast experience? Had it not been for Sunbeam, one of its less scrupulous competitors might have permanently won the prize. Certainly the failure of Sunbeam to persist in its decade-long battle would have meant that there would have been no one around either morally or technically qualified to continue the operation of this station when the iniquities of the original licensee were ultimately exposed. Are we to say that, in the light of these considerations, the Commission was without any power whatsoever to take this operation by Sunbeam into account as constituting broadcast experience?

We think the question answers itself, especially when we remind ourselves that it is the Commission which is the expert body created by Congress to regulate this industry. *Ashbacker* sharply illuminates our function to serve as a guardian of the basic fairness which should characterize the procedures by which the Commission makes its substantive determinations. We are called upon in this in-

**5.** The dissent in this case reflected a concern that there be no misconception to the effect that once a license is granted its renewal is largely automatic. Our recent decision in Office of Communication of the United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (decided March 25, 1966), should serve to dispel any such notion.

**6.** In respect of the first of these, namely, broadcast experience, it seems clear that the Commission counted, in the licensee's broadcast experience, the experience representing the operation of the station under the license for which a renewal was sought. In its opinion the Commission, in addressing itself to

the category of broadcast experience, described the two principal owners and operators of the licensee as having "an impressive background of broadcast experience, also encompassing operation of a television station in the Miami area." This last could only have referred to the operation under the four-months license. In its brief, appellant in *South Florida* pointed this out, and argued that the Commission had acted unfairly in taking it into consideration. Thus it is that some ambiguity attaches to the court's statement in *South Florida* that in none of the categories other than broadcast *performance* was the licensee "given an unfair advantage by virtue of being a license renewal applicant."

stance only to deal with a claim that, in the special context of this renewal application, the Commission's recognition of Sunbeam's experience in operating under this license was intolerable as against an applicant who first appeared on the scene six months after that operation had begun pursuant to the Commission's determination that it was in the public interest for Sunbeam to do so. We are far from persuaded that in this case the Commission's concept of basic fairness needs any correction by us.

### III

What we have concluded thus far is that there is nothing in the statute, read in the light of *Ashbacker*, which prohibits the Commission from counting as broadcast *experience* Sunbeam's operations under the authority of the license; and we have expressed the view that, on this record at any rate, the Commission's action in so doing was not, without more, an abuse of its discretion resulting in an unacceptable unfairness to Community.

Community has also argued, however, that the Commission has violated its own rules. Even if it were proper to treat Sunbeam as an ordinary licensee for four months and to credit it with that period of experience, the Commission erred, so it is said, in taking cognizance also of the eight additional months in the hold-over period which followed upon the four months specified in the license and lasted until the record was closed in the comparative hearing. Community points in this regard to Section 1.62(a) of the Commission's Rules and Regulations, 47 C.F.R. § 1.62 (a) (1) (1965), which is as follows:

Where there is pending before the Commission at the time of expiration of license any proper and timely application for renewal of license with respect to any activity of a continuing nature, in accordance with the provisions of section 9(b) of the Administrative Procedure Act, such license shall continue in effect without further action by the Commission until

such time as the Commission shall make a final determination with respect to the renewal application. No operation by any licensee under this section shall be construed as a finding by the Commission that the operation will serve the public interest, convenience, or necessity, nor shall such operation in any way affect or limit the action of the Commission with respect to any pending application or proceeding.

It argues that to take into account the hold-over operation as broadcast experience is to ignore the Rule's ban upon allowing "such operation [to] in any way affect" the Commission's disposition of the renewal application.

The hold-over period presently has a statutory foundation, first provided in 1946 in Section 9(b) of the Administrative Procedure Act, 5 U.S.C. § 1008(b), and specifically spelled out in 1952 by the addition of Section 307(d) to the Communications Act. Rule 1.62(a) since 1952 has reflected that fact, 17 Fed.Reg. 7290, but the origins of the Rule lie in an earlier time when this was not true. In 1938 the Commission had no explicit statutory authority to authorize a hold-over operation, but it did promulgate a rule in which it assumed for itself a discretion to grant a "temporary extension" of an expiring license pending the disposition of an application for renewal. This rule, however, had a proviso that "such temporary extension of license will in no wise affect or limit the action of the Commission with respect to any pending application or proceeding." 47 C.F.R. § 1.82 (1938).

Thus it would appear that, at a time when Congress had not yet acted expressly to provide for the continuation *pendente lite* of the license of a renewal applicant, the Commission was careful to admonish that a grant by it of this privilege was not to tie its hands or raise false hopes with respect to the eventual disposition it would make of the renewal application. In 1952 when the rule was rewritten to reflect the Congressional grant of hold-over authority, the lan-

guage of the old proviso was obviously carried forward, although the need for which it was originally devised would seem to have largely disappeared when Congress made the hold-over mandatory; or, to put it another way, when the hold-over no longer resulted from an exercise of the Commission's self-assumed discretion in a particular case, there was little or no need to caution that the Commission's action in permitting a hold-over was not to be taken as a commitment by it to ultimate renewal.

The Commission at least has not construed its own rule as excluding consideration of the hold-over period for some purposes. In *South Florida*, it reversed its Examiner for refusing to allow the four-months licensee to put in evidence of its broadcast *performance* during the hold-over period; and, as noted earlier, it appeared to give that licensee credit for broadcast *experience* in respect of that same period of time. The Commission's Broadcast Bureau has, as described by the Examiner in *South Florida*, "taken the position that this rule was not intended to prevent an applicant for renewal from showing performance beyond the license period," although in that

case the Bureau believed, and the Examiner agreed, that there should be a discretionary determination to cut it off after four months.[7]

We think this is perhaps another case where an agency unnecessarily creates problems for itself and for us by failing to reexamine periodically the words used in its rules in the light of circumstances quite different from those in which the words were first employed. But, in the light of that history, we are not persuaded that the words of Rule 1.62(a) are to be taken as disabling the Commission completely from taking into account as broadcast *experience* Sunbeam's eight months of operation between the four months expressly awarded it and the time needed for the receipt of new applications and the holding of a comparative hearing. Without repeating the special considerations already detailed above with respect to Sunbeam, we are certainly not disposed to say that the construction which the Commission has given its own Rule in relation to this case has rendered its proceedings procedurally unfair.[8]

Affirmed.

---

7. The Examiner in *South Florida* limited consideration of performance to the four months period because of what he referred to as "possible intervening rights of private parties." He thus appeared to conceive of a four months license as enjoying a status of greater substance than a "temporary authorization" but of lesser dignity than a license endowed with the maximum term. The problem remains one of essential fairness as between the competitors. In the case of the "temporary authorization," the competitors are all alike in the sense that the problem there is to let one of them operate the station pending a determination of which is best qualified. There is an obvious inequity in letting the temporary operator take advantage of his selection on a non-comparative basis to win permanent preferment over the others. See Community Broadcasting Co.

v. FCC, 107 U.S.App.D.C. 95, 274 F.2d 753 (1960). But the four months licensee, as in the case of Sunbeam here, has been through a comparative hearing, has established his own qualifications, and has survived the disqualification of all his competitors. Surely the concept of fairness does not require that he be made to run the gantlet of a wholly new set of competitors before he be given any license at all. And, once given such license albeit under more onerous time limitations than would normally apply, the Commission may exercise its discretion, in a case it thinks proper, to take that operation into account in weighing the licensee's qualifications as against those of new applicants upon renewal.

8. Without particularizing appellant's other contentions, we find nothing of such significance as to require further treatment. Cf. Note 1, *supra*.