**L. B. WILSON, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,
Coral Television Corporation, Intervenor.
No. 20845.**

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 20, 1967.

Decided May 23, 1968.

Mr. Robert A. Marmet, Washington, D. C., with whom Mr. Peter L. Koff, Washington, D. C., was on the brief, for appellant.

Mr. William L. Fishman, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Lenore G. Ehrig and Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, also entered appearances for appellee.

Mr. Thomas N. Dowd, Washington, D. C., for intervenor. Messrs. Harold David Cohen, Robert M. Lichtman and Peter D. O'Connell, Washington, D. C., were on the brief for intervenor.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

We review an order of the Federal Communications Commission, entered without hearing and over the dissent of three Commissioners, granting a modification of Coral Television Corporation's permit to construct a television broadcast facility in South Miami, Florida. The order also rejected the Petition to Deny of L. B. Wilson, Inc., the licensee of a television station in Miami.[1] Wilson had alleged that Coral's principals failed to disclose a transfer of corporate control as required by Section 310(b) of the Communications Act of 1934[2] and that such failure adversely reflects on the character of Coral's principals and their ability to operate in the public interest. But the Commission found that even though the 10 original stockholders personally hold less than 50% of Coral, they never concealed this development and more importantly they continue to exercise de facto control through agreements empowering them to vote a majority of Coral shares. Wilson's counter allegation is that since there are now 24 stockholders, the Commission should also have considered whether the largest single stockholder (35%), C. Terrance Clyne, and his appointee to the Board of Directors (5%), Hy Gardner, are in privity and, through the block vote of their minority holdings, effectively control Coral.

---

1. Section 309(d) of the Communications Act of 1934, 48 Stat. 1085 (1934), as amended 47 U.S.C. § 309(d) (1964), requires Wilson's petition to contain specific allegations to show its interest as a party and to show that a "grant of the application would be prima facie inconsistent with [the public interest, convenience and necessity]." We have said that "What is required is merely an articulated statement of some fact or situation which would tend to show, if established at a hearing, that the grant of the license contravened public interest, convenience, and necessity * * *." Federal Broadcasting System v. FCC, 96 U.S.App.D.C. 260, 263, 225 F.2d 560, 563 (1955).

2. 48 Stat. 1086 (1934), as amended 47 U.S.C. § 310(b) (1964):
   No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.

In considering this case we bear in mind the critical importance of the disclosure provision of Section 310(b) and Congress' continuing interest in insuring a high standard of broadcast service. Instead of relying on direct control of programming, which would raise the spector of censorship and constitutional doubts,[3] the regulatory scheme emphasizes a review of the character and qualifications of those who seek to operate or control licensed facilities. Congress has required full disclosure of matters affecting the character qualifications of applicants for licenses[4] and has provided for a comparative test of their qualifications and program plans.[5] Thus the Commission grants a license to the most highly qualified applicant.

■■■ On the other hand the transferee of a license is simply one who is willing to pay the most money for the license. The Commission may not consider whether others are better qualified.[6] But full disclosure is required for matters affecting the character qualifications of applicants for transfer of licenses[7] and for transfer of control of corporations holding a license.[8] Conceivably, the failure to make a proper disclosure could reflect adversely upon the parties.[9] And the Commission may order an investigation and hearing to determine whether the disclosure is proper and whether a proposed transfer is in the public interest.[10] For example, whether the application is for an original grant or transfer the Commission must be assured that the interested parties do not "seek [a station] for sale rather than service."[11]

■■■ To assist the Commission in these proceedings aggrieved private parties are also encouraged to participate as private attorneys general.[12] However, in creating a role for private parties, Congress did not intend to relieve the Commission of its responsibilities and allow the parties to limit the issues, thereby leaving it in the position of a "traffic policeman with power to consider merely the financial and technical qualifications of the applicant."[13] As we have said, "the statute contemplates that * * * the Commission inquiry will extend beyond matters alleged in the

---

3. See Note, 108 U.Pa.L.Rev. 868, 880 (1960); Farmers Educational and Cooperative Union etc. v. WDAY, Inc., 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959) ("Thus, expressly applying this country's tradition of free expression to the field of radio broadcasting, Congress has from the first emphatically forbidden the Commission to exercise any power of censorship over radio communication." Id. at 529–530, 79 S.Ct. at 1305); Section 326 of the 1934 Act, 48 Stat. 1091 (1934), as amended 47 U.S.C. § 326 (1948), was taken from § 29 of the Radio Act of 1927, 44 Stat. 1172, and provides that:

    Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.

4. 48 Stat. 1084 (1934), as amended 47 U.S.C. § 308(b) (1962).

5. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

6. 48 Stat. 1086 (1934), as amended 47 U.S.C. § 310(b) (1964).

7. Id.

8. Id.

9. FCC v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 91 L.Ed. 204 (1946).

10. 48 Stat. 1085 (1934), as amended 47 U.S.C. § 309(d) (2) (1964):

    If a substantial and material question of fact is presented or if the Commission *for any reason* is unable to find that grant of the application would be consistent with [the public interest, convenience and necessity, the Commission may order a hearing] [Emphasis added].

11. Folkways Broadcasting Company, Inc. v. FCC, 126 U.S.App.D.C. 123, 375 F.2d 299, 302 (1967).

12. 48 Stat. 1085 (1934), as amended 47 U.S.C. § 309(d) (1) (1964).

13. Mansfield Journal Co. v. FCC, 86 U.S. App.D.C. 102, 106, 180 F.2d 28, 32 (1950).

protest in order to reach any issue which may be relevant in determining the legality of the challenged grant."[14] According to the Commission's rules,[15] one such issue is trafficking. That issue may lie behind any control transfer, and is simply too important to let the parties "control the flow of information to [the Commission]."[16]

The information before the Commission in this case showed the following. In 1964, when Coral was awarded the license to construct Channel 6,[17] the corporation was controlled by 10 original stockholders who held 100 shares issued out of 500 shares authorized.[18] The remaining shares were issued in 1965 as follows: 12 shares were given to certain original stockholders for services rendered; 188 shares were sold to the original stockholders and their families at $875 per share; and 200 shares were sold to Clyne at $750 per share. Clyne's purchase of 40% of Coral was pursuant to a Stock Purchase Agreement and conditioned upon his obtaining a $600,000 loan for Coral. The Agreement also made him executive director of the corporation, gave him the right to select three of the seven members of the Board of Directors, and provided that the station could not be sold without an affirmative vote of 65% of the Coral stock. At the time of the Commission's order, Coral's ownership report disclosed 24 holders of stock including one Hy Gardner, a Clyne appointee to the Board of Directors, who bought 25 shares of Coral from Clyne. The report also showed that although the original stockholders held legal title to only 217 shares of stock (43.4%), they were still able to control a majority of 252 shares (50.4%) because of voting arrangements with members of their family to whom they had distributed stock.

The Commission was of the view that since a majority of stock passed to others than the original stockholders, de jure control of the company had been transferred even though the original stockholders were able to vote a majority of the stock. But it concluded that since Coral had not concealed or misrepresented the foregoing information in its periodic ownership reports, Coral's failure to announce this de jure transfer of control, as required by Section 310(b) of the 1934 Act, was an honest error in judgment and did not reflect bad faith. Moreover, the Commission found that Clyne did not have de facto control of the corporation. Whatever prerogatives he exercised were not inconsistent with his position as the largest single stockholder and were offset by the power which the 10 original stockholders main-

14. Clarksburg Publishing Co. v. FCC, 96 U.S.App.D.C. 211, 215, 225 F.2d 511, 515 (1955). *See also* Ward v. Anderson, 93 U.S.App.D.C. 156, 158–159, 208 F.2d 48, 50 (1953).

15. 47 C.F.R. § 1597 (1967).

16. Citizens TV Protest Committee v. FCC, 121 U.S.App.D.C. 50, 56, 348 F.2d 56, 62 (1965).

17. Channel 6 was first assigned to the Miami area in 1957. At that time the Commission expected its facilities to be located within the city of Miami. Miami Drop-In Case, 15 Pike & Fischer, R. R. 1638a (1957). Thereafter Coral, Publix Television Corporation and South Florida Amusement Co., Inc. applied for this channel and participated in a comparative hearing over the next three years. Although the Initial Decision awarded the channel to South Florida, questions involving the character of one of its principals forced reconsideration. These character proceedings ceased when South Florida and Coral agreed that Coral alone would seek the license in exchange for a payment to South Florida for expenses incurred in developing the broadcast facility. This arrangement was approved by the Commission, which granted in 1964 Coral's application for a construction permit in South Miami where Coral believed it could secure the transmitter site which best conformed to the Commission's regulations. Publix Television Corp., 36 F.C.C. 1215, 2 Pike & Fischer R.R.2d 481 (1964).

18. Between 1964 and 1965 one of the original stockholders died and his stock passed to his son as Executor.

tained together through their majority voting control:

> Without the vote of stock owned by someone else, he cannot block sale of the station; he and his appointees own less than a majority of the stock and they cannot, by vote of their stock, control the corporation. Clyne alone cannot designate the majority of the Board of Directors and, lacking numerical superiority on the Board, they cannot control the Board of Directors or corporate policies.

■ Appellants urge, however, that Gardner, one of Clyne's appointees to the Board of Directors, is so linked to Clyne that Gardner will vote his shares at Clyne's direction.[19] If Clyne could block the sale of the corporation in this manner, one of the Commission's criteria for de facto control would have been met. Hence, we conclude that the allegation of privity between Gardner and Clyne required the Commission to hold an evidentiary hearing or to satisfactorily explain why it is unnecessary.[20] The need for such hearing or explanation is enhanced by the fact that the Commission did link together the stock owned by Gardner and Clyne in order to test whether Clyne's current voting power reflected control of management.

■ The Commission, having been alerted to the problem of corporate control, had a duty to explore any related matters which might bear upon the public interest, whether urged by the parties or not.[21] Accordingly, on remand the Commission may not ignore the manner by which Gardner purchased his interest in Coral. The Commission's opinion reveals that shortly after Clyne purchased his interest in the corporation, he sold 25 shares "for the same price per share that he originally paid for [them]." Thus several months after Clyne first bought Coral stock, Gardner was able to purchase it at the same price per share ($750), even though the corporation had since been enriched by a $600,-000 loan and had just been granted permission to locate its main studio in Miami.

The Stock Purchase Agreement which governed the sale of the 200 shares of Coral stock to Clyne provided for fixed procedures for all future non-family transfers of Coral stock. The Seller must (1) notify other stockholders of the shares available, price bid, terms of payment and date of offer; (2) *"offer to sell to other stockholders all or any part of the shares described in the letter at exactly the same price per share and upon exactly the terms as described in the letter* [Emphasis added]"; (3) allow other stockholders 30 days in which to purchase that percentage of shares offered which the number of shares then

---

19. In footnote 2 of its Reply to Opposition to Deny, Wilson alleged that:

    > 2 When Wilson inspected the Commission's ownership report files prior to filing its Petition to Deny, the Coral report (filed April 12, 1966) showing the acquisition by Hy Gardner (and family) of 5% of Coral's stock from Mr. Clyne was not in the file. Since Mr. Gardner is obviously Mr. Clyne's nominee for the Coral Board of Directors (he was elected the same day Mr. Clyne acquired his stock in Coral), *Messrs. Gardner and Clyne are clearly in privity* and this 5% shareholding must be charged to Mr. Clyne for control purposes [Emphasis added].

20. "With questions of the present sort, centering on the character of an applicant, our function is primarily to see whether the Commission's judgment, based on the record as a whole, is reasonable and within its proper discretion." Kidd v. FCC, 112 U.S.App.D.C. 288, 289, 302 F.2d 873, 874 (1962); *accord* Community Broadcasting Corporation v. FCC, 124 U.S.App.D.C. 230, 363 F.2d 717, 718–719 n. 1 (1966). Here, however, the Commission neither considered nor dealt with Wilson's important contention of privity. *Cf.* Kidd v. FCC, *Id.*

21. Clarksburg Publishing Co. v. FCC, *supra* note 11, and Citizens TV Protest Committee v. FCC, *supra* note 12. *But see* Order of Majority in FCC 68–155, 12440, Voluntary Assignment of License of KLAS, Las Vegas, from Las Vegas Television, Inc. to Hughes Tool Co. *Cf.* Dissent of Commissioner Nicholas Johnson (unreported, Feb. 21, 1968).

owned by the selling stockholder bears to the total number of shares then owned by the other stockholders; and (4) limit his sale to the shares not acquired by the other stockholders.

If the Agreement had been observed, 23 other stockholders would have had the opportunity to purchase the shares at $750 per share or $125 per share less than they had paid for Coral stock the last time the shares had been made available. Nothing in the record, however, suggests that this offer was ever made. Questions may arise, for example, whether the failure of the 23 others to insist on the prescribed procedures reflects their recognition of Clyne's control of Coral or their bona fide business judgment, and whether any of the circumstances are inconsistent with the regulatory scheme.

LEVENTHAL, Circuit Judge (concurring):

I have no difficulty with the court's disposition of this case. This concurrence is written only to assure that certain expressions in the majority opinion are not carried over uncritically to a different kind of situation. As the majority point out, the parties cannot control the flow of information to the Commission on the issue of trafficking, or for that matter on any other issue. In a broad sense the Commission has a "duty" to consider matters bearing on the public interest, and specifically matters bearing on transfer of control, though not urged by the parties.[1] However, this mandate to the Commission should not be taken as implying authority in a court to raise issues *sua sponte* where those issues are not fairly within the scope of points presented to the Commission. The general doctrine requiring exhaustion of remedies before an administrative agency[2] is applicable to the Federal Communications Commission,[3] and indeed has been expressly incorporated into the pertinent statute.[4] The exhaustion doctrine is subject to exceptions and is not to be applied in a hidebound way that promotes injustice.[5]

The approach of Judge Bazelon apparently assumes greater freedom in the courts to raise issues in the public interest that were not presented to or considered by the FCC. See Pinellas Broadcasting Co. v. FCC, *supra* (dissenting opinion); Citizens TV Protest Comm. v. FCC, 121 U.S.App.D.C. 50, 56, 348 F.2d 56, 62 (1965); Clarksburg Publishing Co. v. FCC, 96 U.S.App.D.C. 211, 215, 225 F.2d 511, 515 (1955). Apparently the issue of "trafficking" is considered to involve some exception to the requirement of exhaustion of administrative remedies.

---

1. The revelant statute, 47 U.S.C. § 309(d) (1964), directs a hearing where an interested party makes "specific allegations of fact" "supported by affidavit" and "[i]f a substantial and material question of fact is presented." A hearing is also appropriate if the Commission is unable to find that the application grant would be in the public interest.

2. *See* 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 20.06 (1958); L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 454–458 (1965); United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

3. *See, e. g.,* Community Broadcasting Service, Inc. v. FCC, 126 U.S.App.D.C. 258, 377 F.2d 143 (1967); WLIL, Inc. v. FCC, 122 U.S.App.D.C. 246, 352 F.2d 722 (1965); Massachusetts Bay Telecasters, Inc. v. FCC, 104 U.S.App.D.C. 226, 238, 261 F.2d 55, 67 (1958); Albertson v. FCC, 100 U.S.App.D.C. 103, 105, 243 F.2d 209, 211 (1957); O'Neill Broadcasting Co. v. FCC, 100 U.S.App.D.C. 38, 241 F.2d 443 (1956); Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 238–239, 230 F.2d 204, 206–207, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956).

4. 47 U.S.C. § 405 (1964) provides:
   The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order * * * except where the party seeking such review * * * relies on questions of fact or law upon which the Commission * * * has been afforded no opportunity to pass.
   *See* cases cited note 3 *supra.*

5. *See, e. g.,* NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 428, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947); NLRB v. Cheney California Lumber Co., 327 U.S. 385, 388, 66 S.Ct. 553, 90 L.Ed. 739 (1946); Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037

It remains true, however, that the agency's failures (and achievements), are not for general judicial surveillance except as to matters that have been alerted for agency consideration.

In this case, since there must be a remand anyway, the court's indication that consideration be given to factual points thus far only lurking in the record[6] seems reasonably within the role of a reviewing court.[7] Whether this court would have power to do anything about it, if for some reason both the Commission and all parties declined to focus on these factual points, is another question. My present thinking is no, but since the question probably is and will remain academic in this case, I see no need to press the point at this time.

(1941). *See generally* 3 DAVIS, *supra* note 2, at § 20.06–.07; JAFFE, *supra*, note 2, 450–458.

6. Nobody alerted this court or the agency to the fact—if it be a fact—that when Clyne made a transfer to Gardner at his cost the other 23 stockholders had contract rights of first refusal which they failed to exercise, or suggested that this was probative evidence that they were under Clyne's control.

7. Courts and agencies are, after all, in a kind of partnership to serve the public interest. *See* City of Chicago v. FPC, 128 U.S.App.D.C. 107, 385 F.2d 629 (1967).