**MG–TV BROADCASTING COMPANY,**
Appellant,

v.

**FEDERAL COMMUNICATIONS COM-
MISSION**, Appellee,

Seven Arts Broadcasting Co., Inc.,
Intervenor.

No. 21224.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 16, 1968.

Decided Dec. 20, 1968.

Leventhal, Circuit Judge, dissented.

Mr. Harry M. Plotkin, Washington, D. C., with whom Mr. Stephen J. Csontos, Washington, D. C., was on the brief, for appellant. Mr. Gene A. Bechtel, Washington, D. C., also entered an appearance for appellant.

Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Jerome S. Boros, New York City, for intervenor. Messrs. Howard Jay Braun and Peter Shuebruk, Washington, D. C., also entered appearances for intervenor.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

MG-TV Broadcasting Company appeals from an order of the Federal Communications Commission returning as unacceptable its application for a construction permit for UHF Channel 23 in Philadelphia, and granting an extension and permitting assignment of a previously-issued permit for that station. The permit was originally granted to Bernard Rappaport on November 30, 1961. It required that construction be commenced by January 30, 1962, and completed by July 30, 1962, and provided that it would be "automatically forfeited if the station is not ready for operation within the time specified or within such further time as the Commission may allow, unless completion of the station is prevented by causes not under the control of the permittee." [1]

In June of 1962, Rappaport filed with the Commission an application for a six-month extension of the deadline for completing construction, to January 30, 1963.

The application recited that installation of equipment had not begun and that no equipment had been delivered or even ordered. Rappaport attributed the delay to the fact that

[D]uring the first part of this year I was suffering from general ill health, because of which I did not feel up to the task of establishing a new television station. However, I now feel that I am well enough to commence construction of the station.

The Commission granted the extension, but warned Rappaport in its letter of notification that

[A]ny further request for extension of time will not be granted without hearing unless a substantial showing of progress can be made. Mere paper negotiations would not constitute a substantial showing; the purchase and delivery of equipment and the actual construction of facilities would be the type [of] showing required.

The Commission's letter also requested a report within sixty days of "actual progress toward the completion of construction." [2]

On January 28, 1963, two days before his extension expired, Rappaport submitted a second application for extension of the completion date, to July 30, 1963. At the same time, he filed an application for permission to assign the construction permit to New Jersey Television Broadcasting Corp., together with a copy of the contract providing for assignment of the permit contingent upon Commission approval.

In a letter attached as an exhibit to the extension application, Rappaport explained that following the earlier grant of an extension by the Commission and "before I could undertake further plans to construct following recovery from my illness," a representative of New Jersey offered to purchase the permit, and that

1. 47 U.S.C. § 319(b) provides that a construction permit "shall provide that said permit will be automatically forfeited if the station is not ready for operation within the time specified or within such fur-

ther time as the Commission may allow, unless prevented by causes not under control of the grantee."

2. Apparently no such report was ever made.

an agreement had been signed on December 22, 1962. The new extension was requested "to enable me to conclude the proposed transfer and to enable [New Jersey] * * * to proceed with its construction plans for Channel 23." According to the application, no equipment had been delivered or installed, and apparently none had been ordered. Neither ill health nor any other reason beyond Rappaport's control was given for the failure to begin construction.[3]

The assignment application was the subject of "an avalanche of pleadings, charges and countercharges from various parties, as well as inquiries from the Commission," all centering around the qualifications of the proposed assignee, New Jersey; and for over three and one-half years no action on the application was taken by the Commission. On October 24, 1966, Rappaport notified the Commission that the agreement with New Jersey had been terminated; that an agreement assigning the permit to Seven Arts Broadcasting Corp., subject to Commission approval, had been signed on September 26, 1966; and that he was in the process of preparing an application for assignment of the permit to Seven Arts. Accordingly, on November 1, 1966, the Commission dismissed the pending application for assignment to New Jersey.

The application for assignment to Seven Arts was filed November 25, 1966. The contract with Seven Arts provided for payment of between $12,000 and $20,000 as consideration for the transfer, all of which, Rappaport alleged, represented "expenses which have been incurred in connection with preparation, filing, and prosecution of various materials and pleadings which pertain to my construction permit. * * * "[4]

On January 3, 1967, MG-TV tendered for filing an application for a construction permit for Channel 23 and a petition requesting filing and processing of the application. The petition also contained the following notation:

This Petition is filed pursuant to Section 309 of the Communications Act. To the extent that favorable action on this Petition may require denial or dismissal of Application BAPCT 393 [the application for assignment to Seven Arts], the Commission may construe this pleading as a Petition to Deny pursuant to Section 309(d) of the Communications Act.

The petition contained no allegation that Seven Arts was unqualified for a permit to construct and operate the station. Instead, it argued (1) that because of the failure to observe the conditions set forth by the Commission in granting the earlier extension, the permit had "lapsed by its own terms" and the channel was thus vacant; and (2) that approval of the application for extension and assignment would be inconsistent with the public interest and an abuse of discretion.

Petitions to deny the assignment application were filed by New Jersey Broadcasting Corp., and by WIBF Broadcasting Co., a permittee of Station WIBF–TV (Channel 29), Philadelphia.

---

3. A letter from Rappaport's doctor was submitted to the Commission on November 16, 1963, showing that he had been suffering from a heart condition since September 28, 1960, and that his "condition is such that his activities, both mental and physical, must be greatly restricted." However, in January, 1963, Rappaport had referred to his "recovery" from the illness that had given rise to the earlier extension application. Moreover, under the contract with New Jersey, he was apparently to occupy a staff position with the station. It is also obvious from the doctor's letter that Rappaport was in ill health at the time he filed his initial application for a permit.

4. The Commission has a "long standing policy" limiting consideration for assignment of a construction permit to the out-of-pocket expenses of the assignor in connection with the permit. In this case, the final amount approved was $14,202. The consideration for the proposed New Jersey transfer was $7,000. No explanation of the additional expenses appears in the record, although it does appear that $5,500 of the consideration in the Seven Arts transaction represented legal fees to Rappaport's brother.

The primary grounds advanced related to Rappaport's alleged lack of financial qualifications, and his failure to keep his application up to date in that he neglected to notify the Commission of a drastic change in his net worth.[5] WIBF also alleged that, since Seven Arts produced and supplied films to independent television stations, it (WIBF) would be deprived of a potential supplier of film productions if Seven Arts were permitted to enter the broadcast field.

The Commission granted both Rappaport's applications without a hearing. Its opinion discusses the petitions to deny filed by New Jersey and WIBF, concluding that both petitioners lacked standing as "parties in interest" and, in addition, rejecting their arguments on the merits. But there is no discussion of appellant's contentions, or of its standing to challenge the applications. The Commission simply notes that "since the assignment application will be granted, MG-TV Broadcasting Company's tendered application for a new construction permit for Channel 23 Philadelphia will be returned, and its petition dismissed." The only other mention of appellant's pleadings appears at the end of the opinion, where it is ordered that "the application for a new construction permit for Channel 23, Philadelphia, Pennsylvania, tendered for filing by MG-TV Broadcasting Company is returned as unacceptable." Appellant now appeals this order.[6]

▮ We reject appellant's contention that the Rappaport permit had "lapsed by its own terms"; that the station was thus left vacant; and that the Commission therefore had no choice but to give consideration to the MG-TV application in a comparative proceeding.[7] Appellant's argument is premised on the provision in the original permit that it would be "automatically forfeited" if the construction deadline were not met, and on the Commission's statement in granting the earlier extension, to January 30, 1963, that no further extension would be granted absent a "substantial showing of progress." However, it is well settled that a construction permit does not "lapse," notwithstanding a failure to abide by its terms, until the Commission declares it forfeited.[8] Therefore, if the Commission acted properly in granting the extension sought by Rappaport, it was correct in returning appellant's application without consideration.

▮ The Commission recognized that "undoubtedly" it could have denied the extension and required surrender of Rappaport's permit, since it made no finding that the failure to construct was due to causes "not under the control of" Rappaport.[9] Thus, the question is whether the Commission committed legal error or abused its discretion by granting the extension to enable assignment of the permit to Seven Arts, rather than declaring the station vacant and holding a comparative hearing looking toward the grant of a new construction permit.

Appellant argues that the record reveals no public interest basis for the Commission's action, stressing Rappaport's failure to commence construction, the absence of any satisfactory explanation, and the fact that extension of the permit was being sought solely to enable him to sell it. Appellant makes no claim that the Commission is forbidden to ex-

---

5. In 1963, in connection with the proposed assignment to New Jersey, Rappaport's net worth was represented to be $482,600; in 1966 he had a negative net worth of $50,000.

6. Appellant originally filed a motion for stay in this court, but did not petition the Commission for reconsideration. Appellant withdrew its motion for stay when the parties entered into a stipulation under which Seven Arts agreed to defer construction pending resolution in this court.

7. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

8. Mass Communicators, Inc. v. FCC, 105 U.S.App.D.C. 277, 266 F.2d 681, cert. denied, 361 U.S. 828, 80 S.Ct. 76, 4 L.Ed. 2d 71 (1959); United Detroit Theaters Corp. v. FCC, 85 U.S.App.D.C. 239, 178 F.2d 700 (1949).

9. 47 U.S.C. § 319(b), *supra* note 1.

tend the life of a "bare" permit, or that extension may never be granted for purposes of assignment. Rather, it contends that given all the circumstances presented here, and in the absence of adequate findings and reasons, the Commission's action cannot be sustained. We agree.

Although it did not so state in its opinion, the Commission now maintains on appeal that its action is supported by a policy of fostering development of UHF broadcasting. In its brief the Commission states that it has been "purposefully lenient" in granting extensions of UHF permits, and that "this has been especially true when assignments have been in the offing." The history and rationale of this policy are elaborated in a supplemental memorandum filed by the Commission following oral argument. In the early days of UHF, the Commission states, extensions were "almost automatically granted upon the mere allegation that it was economically unfeasible to construct at the time." With improving economic conditions, and the passage in 1962 of the all-channel receiver legislation,[10] the Commission decided that it would no longer accept the excuse of economic unfeasibility alone.[11] Nevertheless, it continued to grant extensions "where a reason was advanced which looked toward the actual inception of service," including assignment of the permit to a person "willing to commence broadcasting."[12]

Whatever the merits of the Commission's liberal-extension policy in general, we think the record reveals a need for further exploration of its applicability to the circumstances presented here. Manifestly this was not a situation in which the Commission could assume that no qualified person other than the proposed assignee would be willing to undertake construction.[13] Appellant had tendered its application, and without a comparative hearing there was no reason to believe it was less well qualified than Seven Arts.

■■ It may be, of course, that the Commission viewed the assignment to Seven Arts not as the *only* means of putting the station in operation, but as the most expeditious. Certainly that might have been the case had Rappaport already undertaken partial construction. However, as we read the record no significant progress toward construction had been made. Thus the only time saved by the assignment appears to be that which would be consumed in a comparative proceeding to assess the qualifications of other applicants besides Seven Arts.[14] (This marginal shortening of a purely administrative delay must be weighed against the public interest in having service provided by the best qualified applicant available.[15]) "The basic teaching of the *Ashbacker* case is that comparative consideration by the Commission and competition between the ap-

10. 47 U.S.C. § 303(s).

11. The Thames Broadcasting Corp., 20 P & F RADIO REG. 1023 (1960).

12. Joe L. Smith, Jr., Inc., 5 P & F RADIO REG.2d 582, 586 (1965); Joe L. Smith, Jr., Inc., 6 P & F RADIO REG.2d 347 (1965); Joe L. Smith, Jr., Inc., 6 P & F RADIO REG.2d 27 (1965).

13. In the *Joe L. Smith* cases, *supra* note 12, a competing applicant came forward in only one of six cases involving extensions of permits for purposes of assignment. See also Connecticut Radio Foundation, Inc., 8 P & F RADIO REG. 2d 162, 780 (1966).

14. We are informed that in all but one of the six *Joe L. Smith* cases, *supra* note 12, involving grants of extension for purposes of assignment, the stations had been constructed and had actually been placed in operation pursuant either to program test authority or special temporary authority.

15. The Commission has made clear in the VHF field that it "will not permit a price to be placed on the transfer of a bare license." Bonanza Broadcasting Corp., 11 P & F RADIO REG.2d 1072 (1967); Donald L. Horton, 11 P & F RADIO REG.2d 417 (1967); see also Raytheon Mfg. Co., 5 P & F RADIO REG. 389 (1949).

plicants is the process most likely to serve the public." [16]

Conceivably, the Commission could have been motivated here by a desire to permit Rappaport to recoup his "equity," as a means of encouraging other investors to develop UHF facilities. But Rappaport's investment in the station was limited to the legal fees and other expenses incurred in securing and preserving the permit. In these circumstances the Commission's action could hardly serve as encouragement to other permittees to undertake construction [17]— and indeed it could well have the opposite effect, thus defeating the plain intent of Congress that stations for which construction permits · have been granted should begin operation without undue delay.[18]

In the absence of countervailing public interest considerations, Rappaport's "equity" might be sufficient to support the Commission's decision. But his *bona fides* is hardly apparent on the face of the record. Without explanation of the Commission's decision, we cannot discern its implications for the public interest. More is at stake than the relatively trifling sums Rappaport stands to receive. Just as "trafficking" in broadcast licenses is inimical to the public interest, so

may an unnecessarily lenient policy toward assignments of construction permits, especially where construction was never even begun, encourage a kindred evil. Such a policy may carry the risk of attracting applications from speculators who may have neither adequate finances nor a firm intention to undertake actual broadcasting: if they succeed in putting together a going operation, they may strike it rich; if they fail, they can recoup their expenses.

We do not say that the Commission's decision was necessarily wrong, or that the Commission abused its concededly broad discretion. We do say that the questions appellant has raised are substantial enough to require at least a reasoned answer.

Intervenor contends that appellant's position in this case constitutes a "calculated effort to leap-frog" section 310(b) of the Communications Act. That section provides that in disposing of applications to transfer construction permits or licenses the Commission "may not consider whether the public interest, convenience, and necessity might be served by the transfer * * * of the permit or license to a person other than the proposed transferee or assignee." [19] The legislative history makes clear that this

---

16. Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95, 274 F.2d 753, 759 (1960).

17. In Harcourt, Brace and World Publishing Co., 11 F.C.C.2d 347 (1967), the Commission, without opinion, granted an extension of a UHF construction permit to enable its assignment. Three Commissioners dissented. Commissioner Bartley stated:

I vote for an evidentiary hearing to determine how the public interest is served by granting the assignor's application to extend completion date merely for the purpose of assigning the construction permit. * * * Commissioner Cox stated:
* * * I see no great public interest to be served by allowing [the assignor] * * * to recoup the minimal expenses it incurred in its fleeting entry into broadcasting. * * * *Id.* at 347–348.

Permitting a permittee to recoup his in-

vestment could not be justified on equitable or humanitarian grounds if no interest of the *public* were served thereby. "The public, not some private interest, convenience, or necessity governs the issuance of licenses under the Act." Ashbacker Radio Co. v. FCC, *supra* note 7, 326 U.S. at 333, 66 S.Ct. at 151. See also FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

18. See 47 U.S.C. § 319(b) *supra* note 1. The dissents in *Harcourt, Brace and World Publishing Co., supra* note 17, may well reflect a recognition that changing economic conditions and, most crucially, the 1962 all-channel receiver legislation, *supra* note 10, have removed whatever justification remained for the Commission's policy of treating UHF permittees more leniently than owners of VHF permits, see note 15, *supra*.

19. 47 U.S.C. § 310(b).

provision was designed to "annul the so-called AVCO procedure," whereby the Commission subjected assignment applications to the type of comparative consideration employed in passing on initial applications for permits or licenses.[20] Thus, where permission is sought to assign a valid existing permit, the only question is whether the proposed assignee possesses the minimum qualifications consistent with the "public interest, convenience and necessity."

But of course nothing in section 310(b) forbids the Commission to consider whether the assignor's permit is valid. Rappaport sought not only permission to assign, but also extension of a permit whose terms precluded extension under the apparent circumstances of this case. The statute denies appellant any right to consideration as a competing applicant for assignment of the Rappaport permit, *if* the permit continues to be valid. But appellant's whole argument was that the Commission should deny the application for extension and declare the permit forfeited. The Commission's opinion totally fails to confront this substantial contention, and Section 310(b) in no wise excuses the failure.[21]

Nor do we think the Commission's failure to come to grips with the substance of appellant's contentions is excused by the procedural posture in which they were presented. Appellant filed two pleadings before the Commission. One was its application for a construction permit, the other was its "petition." The petition sought filing and processing of the application. Probably because it recognized the weakness of its argument that the permit had "lapsed by it own terms" irrespective of any Commission action on the applications for assignment and extension, appellant also requested that its petition be construed as a "petition to deny" those applications pursuant to section 309 of the Act.[22]

It is clear that a petition to deny may not be filed in opposition to an application for extension of a construction permit.[23] However, a "party in interest" [24] may file a petition to deny an application to assign a construction permit.[25] Thus, appellant's petition, on its face, was properly before the Commission.

Appellant argued that the assignment application should be denied because the permit should not be extended. The only question is whether, by refusing to authorize petitions to deny an *extension*,

20. S.Rep.No. 44, 82nd Cong., 1st Sess. 8 (Jan. 25, 1951).

21. In enacting § 310(b), Congress surely could not have intended to grant a permittee an absolute right to dispose of his permit in the circumstances presented here. Adoption of such a rule would result in the anomaly that, if Rappaport had constructed his station and put it in operation, the license would have been subject to competing applications in three years, at most, 47 U.S.C. § 307(d), but by holding his permit for sale rather than service he could forestall competing applications for a much longer period. A license is merely a temporary permission to make use of rights belonging to the public, and confers no proprietary interest. 47 U.S.C. § 301; see Crowder v. FCC, 130 U.S.App.D.C. 198, 399 F.2d 569 (decided June 20, 1968) slip opinion, p. 7. This is true *a fortiori* of construction permits which have not been placed in service.

22. 47 U.S.C. § 309(d) (1).

23. See 47 U.S.C. §§ 309(d) (1), 309(b), 309(c) (2) (D). A "person aggrieved" may, however, challenge the Commission's action by filing a petition for reconsideration even if it had no right to file a petition to deny in advance of the ruling. 47 U.S.C. § 405.

24. We think it is clear that appellant was a "party in interest." Denial of either or both applications would have left the station vacant and available for appellant's application. This was sufficient to confer standing. See FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Southwestern Publishing Co. v. FCC, 100 U.S. App.D.C. 251, 255, 243 F.2d 829, 833 (1957); Mass Communicators, Inc. v. FCC, *supra* note 8.

25. See 47 U.S.C. §§ 309(d) (1), 309(b), 309(a), 309(c), 308, 310(b).

Congress implicitly also precluded petitions to deny an *assignment* based on arguments against an extension which is essential to the validity of the assignment.[26] We see no reason to read such a prohibition into the statute. Sections 309(b) and (d) state the general rule permitting petitions to deny and requiring hearings. Section 309(c) makes a few relatively minor exceptions from this policy, apparently in the interests of expedition. Where a permit-holder has encountered delays and seeks an extension to complete construction, elaborate procedural requirements might well only compound the injury to the public interest from the failure to construct on time. Accordingly, one of the exceptions excludes petitions to deny an extension. But where an assignor seeks extension in order to give up construction altogether, additional public interests intrude. Absent a clear expression of intent, we should not assume that Congress meant to preclude direct challenges to extensions of this sort. As this case illustrates, such extensions may raise important questions of substantive policy.

█ The alternative means of presenting these questions is by a post-decision petition for reconsideration. We do not think appellant was obliged to take this circuitous route. But even if it was, its failure to do so did not authorize the Commission to close its eyes to the public interest considerations raised by the petition.[27] Even if the technical nature of the pleadings was not crystal clear, the thrust of the substantive argument was unmistakable. Issues brought to the Commission's attention may not be so cavalierly disregarded.[28]

█ A separate question is whether, even though appellant's petition to deny was properly before the Commission, it was obliged to file a petition for rehearing as a prerequisite to obtaining judicial review. Under Section 405 of the Communications Act, such a petition is required only if "the party seeking such review (1) was not a party to the proceedings resulting in" the "order, decision * * * or action" complained of, or "(2) relies on questions * * * upon which the Commission * * * has been afforded no opportunity to pass." The second of these contingencies is plainly not applicable. As to the first, the Communications Act does not say who is a "party" to a proceeding that does not entail a hearing. In the present case, the Commission decided the assignment issue without looking beyond the papers filed. Since appellant's papers were among those properly filed, we think appellant was a "party to the proceeding resulting in" the challenged order granting the assignment application.[29] This result ac-

---

26. The Commission clearly contemplated that Rappaport's two applications—the one for extension, the other for permission to assign—would stand or fall together. Counsel for the Commission at oral argument stated that, following the dismissal of the application for assignment to New Jersey, the extension application was held pending receipt of the new assignment application "with a view to approval" if the assignee were found qualified.

27. If the Commission desired to compel strict compliance with procedural niceties it could easily have either rejected the petition on that ground, in which event it would undoubtedly have been re-filed as a petition for reconsideration, see note 22 *supra*, or simply held it and treated it as a petition for reconsideration. In fact, it is simply impossible to say *what* the Commission did with ap-

pellant's petition to file its application for a construction permit or, in the alternative, to deny the assignment to Seven Arts. The Commission returned the application as unacceptable and granted the assignment; it said nothing at all about the petition. Whether the Commission refused to treat the petition as a petition to deny, or treated it as such and rejected its contentions, is known only to the Commission.

28. Southwestern Publishing Co. v. FCC, *supra* note 24, 100 U.S.App.D.C. at 254, 243 F.2d at 832; · Clarksburg Publishing Co. v. FCC, 96 U.S.App.D.C. 211, 215, 225 F.2d 511, 515 (1955).

29. The Administrative Procedure Act may provide some support for this conclusion. 47 U.S.C. § 409; O'Neill Broadcasting Co. v. FCC, 100 U.S.App.D.C. 38, 241 F.2d 443 (1956); In re KAKE, 12 P

cords with what appears to be the purpose of the party requirement of Section 405—to forbid appeals by strangers to the proceedings where the Commission has not had an opportunity to consider their objections.

In sum, then, it would appear that appellant's contentions are substantial. If the Commission does not accept them, we think it should at least address itself to them, either by answering them or by explaining why an answer is unnecessary.[30]

The case is reversed and remanded for further proceedings not inconsistent with this opinion.

So ordered.

LEVENTHAL, Circuit Judge, dissenting:

The FCC proceeding involved two questions: first, whether a UHF construction permit should be extended; and, second, whether the holder's application for an assignment should be granted. The court remands, in its own words, "not because the Commission's decision was necessarily wrong * * *" but because "questions appellant has raised are sub-

stantial enough to require at least a reasoned answer."

I cannot join the majority which, in my view, ignores the realities of the administrative process and snubs the discernible reasons underlying the Commission's disposition of this case. This record makes plain both that the public interest questions surrounding this assignment have been considered and that they have been resolved in a manner that finds ample support in the record. The fact that the Commission's decision fails to mention appellant's pleadings does not undercut the validity of a decision made after taking into account the relevant public interest factors. Any requirement that administrative staffs expressly track through the deftly composed verbiage of appellant's pleadings ignores the magnitude of the administrator's busy schedule.[1]

A. *Failure to Mention Appellant's Pleadings.*

Appellant sought, when all is said and done, to block the grant of an extension of a construction permit. Such orders are explicitly insulated from third-party objections by way of a petition to deny.[2]

---

& F RADIO REG.2d 766 (1968). Section 2 of the APA, 5 U.S.C. § 551, defines a party as "a person * * * properly seeking and entitled as of right to be admitted as a party." Since appellant was a "party in interest," see note 24, *supra*, it had a right to party status. The question under the APA definition, then, is only whether appellant was "properly seeking" party status. On that question, we note that as a known party appellant could expect to be named a party if its petition had been designated for hearing, or, if not named, it could petition to intervene after the designation. 47 U.S.C. § 309(e). It had made its interest known and fully participated in the only proceedings the Commission conducted. It is difficult to see what more it could have done in order to be "properly seeking party status." See Gerico Inv. Co. v. FCC, 99 U.S.App.D.C. 379, 240 F.2d 410 (1957); In re KAKE, *supra*.

30. *Cf.* Wilson, Inc., v. FCC, 130 U.S.App. D.C. 156, 397 F.2d 717 (decided May 23, 1968) (slip opinion, p. 7).

1. *Cf.* Rio Grande Radio Family Fellowship, Inc. v. FCC, 132 U.S.App.D.C. 128, 406 F.2d 664 (1968).

2. When section 309 of the Federal Communications Act was revised, Congress sought to streamline the Commission's decision-making process. *See* Hearings Before a Subcommittee on Interstate and Foreign Comm., House of Representatives 96 (86th Cong., 2d Sess.1960). Section 309(c) specifically exempts from the compulsion of formal hearings various routine decisions and also determinations where there had already been an opportunity to litigate the critical issues. The key issue in any licensing proceeding is the award. Thus, Congress saw fit to exempt from hearings petitions for extension which raise routine matters for negotiation between the Commission and the permittee whose merits have already been tested. 47 U.S.C. 309(c)(2)(D) (1964).

Appellant adroitly couched his opposition in the form of an application (for a non-vacant station), to be accepted in the alternative as a petition to deny the assignment application.

Technically, appellant's procedural maneuver may circumvent the barrier erected by section 309(c). But certainly it is contrary to general expectation, if not the spirit of the Act, when an extension order is questioned by way of a Petition to Deny an assignment. Appellant has not seen fit to file for reconsideration, although the petition for rehearing is the procedure provided by the Congress for challenging extension orders.[3] It is not surprising, in view of appellant's ambivalent papers, that a busy Commission failed to comment specifically on MG-TV's arguments.

B. *Justification for the Commission's Order.*

My primary concern, however, is to point out that the Commission's decision stands on its merits, that the record reveals a satisfactory explanation for the delays involved, and further, that settled Commission policies support this extension and assignment.

1. There is no dispute about the first extension. While appellant's pleadings seek through innuendo to create an aura of bad faith, the fact is that Rappaport, the holder of the construction permit, was sick, and the Commission found no evidence of mala fides.

2. Rappaport's second request for an extension and subsequent delay in undertaking construction, is a product of his decision to assign his permit to New Jersey Broadcasting Company, and later

decision to assign the permit to Seven Arts. Appellant emphasizes the three-year delay between Rappaport's application for the assignment to New Jersey and withdrawal of that application. Appellant points also to the admittedly important policy of holding comparative hearings, and argues that its merits should be weighed against those of the proposed assignee.[4] It is suggested that Rappaport's failure to commence construction work makes inapplicable the policy of allowing permittees to recoup their investment.

That no construction work has been commenced is a factor properly cognizable by the Commission, both in a determination to grant an extension, and also in passing on the assignment. Here, there is an obvious explanation for the failure to begin work. The original construction permit authorized building the transmitter at Philadelphia, Pennsylvania; the assignee, New Jersey, planned to locate the transmitter at Camden, New Jersey. Thus, any work undertaken at Philadelphia would have been wasted motion. Nor is Rappaport chargeable with dereliction because as of this time the work has not yet begun. The Commission had his proposed assignment under advisement for three and a half years. During this period the Commission attempted to resolve the problems raised in the various petitions to deny the proposed assignment.

Such negotiations involved time, effort, and expenditures. Additional expenses were involved in arranging for the assignment to Seven Arts, after the negotiations with New Jersey failed to produce results.[5] The Commission, which

---

3. This is made very clear in the House Report: "Subsection (c) of section 309, * * * list several specific exceptions to the 30-day waiting period required by subsection (b). These specific exceptions deal with situations where the matters considered are of minor concern and where the 30-day waiting period and the filing of a petition to deny would serve no useful purpose. The remedy afforded by section 405 of the Act would, however, be available in the event the Commission erred." H.Rept.No.1800, at 11

(86th Cong., 2d Sess.1960), U.S.Code Cong. & Admin.News 1960, p. 3519.

4. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

5. The breakdown of Rappaport's expenses is not itemized with great particularity. About $7,000.00 is attributed to post-1962 endeavors. It is fair to assume that these costs related to negotiations involving both assignments.

explicitly considered these claims for recoupment, found them reasonable, and the record supports the determination.

Appellant traces the policy of allowing permittees to recoup investment to the Commission's objective of fostering UHF development. The contention is that such development is not encouraged by permitting recoupment of merely entrepreneurial expenses. I see no basis on which a court may properly confine an agency to a narrow conception of the entrepreneurial function that sees benefits to UHF development only in terms of tangible work progress.[6] Even before construction is undertaken, time and energy is expended in ascertaining the commercial feasibility of locating a channel in a given area and determining the appropriate site for a transmitter.

This is not to say that widespread "trafficking" in licenses should be tolerated. But once an agency has—and I think justifiably—defined a policy of promoting UHF ventures by facilitating assignments of permits, I see no basis for a judicial doctrine that permits recovery of some out-of-pocket expenses, but precludes recovery of others which are realistically necessary and inevitable for business ventures. Moreover, a rigid distinction between investment in construction and intangibles may serve to encourage token construction and hence economic waste.

While the Order did not deal with all these matters, I cannot reasonably insist that the Commission dot every "i" and cross every "t," to make an order safe from judicial interjection. An oft-reiterated policy, such as that of encouraging UHF development, may be administratively and judicially noticed. An agency's order will not be set aside even though its findings "leave much to be desired" if its path "can be discerned."[7] I have no difficulty discerning and following the Commission's path.

It scants balance and perspective to translate a proper concern about trafficking in licenses into an auditor's obsession with surveillance of a request for reimbursement of a modest sum, not nearly large enough to arouse suspicion as to the presence of "speculative" activity. The Commission expressly passed on the reasonableness of the consideration agreed on by Rappaport and Seven Arts. In view of the well-settled administrative policy in favor of these assignments, and the absence of evidence undercutting Rappaport's bona fides, I would affirm without hesitation.

3. *Comparative hearings and expediency.* It is also appropriate to add a word about the proper emphasis to be accorded the policy in favor of comparative hearings. The majority suggests that the mere desire to put the station into service as expeditiously as possible does not outweigh our policy in favor of comparative hearings. But while the Commission may properly consider the latter objective, Congress has clearly decided that general comparatives are not to be required in connection with assignment proceedings. The issue prescribed by Congress is, not who is best qualified, but is the assignee qualified? Appellant does not argue here that the

6. It is argued that no precedent exists for tolerating the assignment of a "bare" construction permit. Yet there is no dispute that even recent Commission decisions reflect a desire to promote UHF by a lenient policy toward assignments. *See* Harcourt, Brace and World Co., FCC Report No. 6944 (Jan. 9, 1968); Joe L. Smith, 1 F.C.C.2d 986 (1965); Connecticut Radio Foundation, Inc., 8 P & F Radio Reg.2d 162 (1966) ("grants of extensions looking toward assignment of UHF permits to persons who will construct and grants of applications for

modifications where construction will be undertaken within a specified time, will foster the institution of additional UHF television service." *Id.* at 163.). Moreover, one of the six cases consolidated in the *Joe L. Smith* proceeding, *supra*, involved precisely the situation now before the Commission. There the Commission extended a bare construction permit knowing it would be assigned, where another applicant sought the station.

7. *See* Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

assignee is not qualified. I do not see why the Commission must exalt a policy of comparative hearings above all other considerations, when there is no question of "bad faith" and when there is a qualified assignee who will expedite operations and give the public the benefit of a working station. It is unrealistic to ignore the duration of comparative proceedings and it does not accord with legislative policy to elevate the objective of comparative hearings to a peak of paramountcy for all situations. In the context of the proceedings before the Commission the admitted value of hearings is just one more factor to be considered.

The agency acted reasonably and I see no error of law or abuse of discretion.