Edward A. BAKER, d/b/a Union City Radio, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Land O'Lakes Broadcasting Corporation, Intervenor.

No. 87-1018.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1987.

Decided Dec. 1, 1987.

Christopher D. Imlay, Washington, D.C., for appellant.

Sue Ann Preskill, Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief for appellee.

Lauren A. Colby, Frederick, Md., was on the brief for intervenor, Land O'Lakes Broadcasting Corp.

Before RUTH BADER GINSBURG and STARR, Circuit Judges, and GESELL, District Judge.*

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is an appeal from an order of the Federal Communications Commission upholding a decision by the Commission's Review Board granting an application to build an AM radio station in Troy, Ohio. Edward Baker, a contestant who had proposed to build a station in Union City, Indiana, asserts that the Commission erred in upholding the Review Board's reversal of the Administrative Law Judge's decision in his favor. We conclude that appellant's contention is well founded; accordingly, we reverse and remand to the Commission for further action consistent with this opinion.

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

1. The "A" cutoff date is, more precisely, the date established by the FCC by which all mutually

## I

The pertinent facts can be briefly stated. In February 1979, Land O'Lakes Broadcasting Corporation (by its predecessor Cloverleaf Broadcasting Corporation) was issued a construction permit for a new AM broadcast station in Troy, Ohio, on 1510 kHz. No station, however, was constructed; instead, in July 1982, Land O'Lakes filed an application to modify its construction permit to change the frequency to 1030 kHz. The new frequency, which Land O'Lakes found more to its liking due to its greater commercial potential, became available as a result of the Commission's decision in 1980 to permit new stations on certain formerly "clear channel" frequencies. Brief for Appellee at 8 n. 10.

This development did not go unnoticed, however. In the wake of Land O'Lakes' modification application, a number of contestants from several cities in Ohio, Indiana and five other States filed competing applications for this new spot on the dial. Shortly after the "A" cutoff date for filing applications,[1] Land O'Lakes filed an amendment to its application for modification. In pertinent part, that amendment stated as follows:

> Please amend the above application to change from an application for modification of a construction permit to an application for a construction permit.... [I]n light of current economic conditions, it no longer appears feasible to construct a [suitable facility] on a relatively undesirable frequency, while still maintaining an economically viable facility. Therefore, applicant has decided not to request any additional extentions of its construction permit. Rather, the permit will be allowed to expire and/or surrendered for cancellation, and the applicant desires to pursue its request for facilities on 1040 khz [sic], as an applicant for a new construction permit.

exclusive applications for new stations and petitions to deny consideration of submitted applications must be filed. 47 C.F.R. § 73.3571(c) (1983). In this instance, the "A" cutoff date was November 22, 1982.

Amendment to Application for Modification of Construction Permit (filed Dec. 30, 1982), Joint Appendix (J.A.) at 15–16.

The apparent clarity of this proffered amendment was muddied by a transmittal letter from Land O'Lakes counsel. Contemplating the unhappy possibility that the proffered amendment might be deemed a "major change" within the meaning of the Commission's rules[2] (and thus require Land O'Lakes to be removed from consideration in the comparative proceeding),[3] Land O'Lakes' counsel stated:

This amendment is tendered on the specific condition that it not be considered major [sic] change and, that it not result in the assignment of a new file number. In the event the Commission disagrees or believes, for any reason, that the amendment requires the assignment of a new file number, applicant does not desire to submit the amendment.

Letter from Lauren A. Colby, Attorney for Cloverleaf Broadcasting Corp., to William Tricarico, Secretary FCC (Dec. 30, 1982), J.A. at 14.

Thus matters stood until much later when, in May 1984, the FCC's Mass Media Bureau, in a two-sentence letter to Land O'Lakes' counsel, finally responded to the December 1982 request. In terse fashion, the Bureau's letter set forth the following conclusion: "Good cause has not been shown for the acceptance of this amendment; consequently, as you have request-ed, the amendment is being returned to you." Letter from H. John Morgan, Mass Media Bureau, to Lauren A. Colby (May 4, 1984) (J.A. at 13).

In short order, the Mass Media Bureau issued a hearing designation order setting the competing applications for hearing. J.A. at 2. Although the order did not separately address Land O'Lakes' application, it stated in general fashion:

[A]ll applicants are qualified to construct and operate as proposed.... As the proposals are for different communities, we will specify an issue to determine pursuant to section 307(b) of the Communications Act of 1934, as amended, which proposal (or combination of proposals) would best provide a fair, efficient, and equitable distribution of radio service.

J.A. at 5. Section 307(b), which is referenced in the hearing designation order, is of central importance to this case. It provides in relevant part as follows: "In considering applications for licenses, and modifications and renewals thereof, ... the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a. fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b) (1982).[4]

Land O'Lakes' application thus entered the competition for the 1030 kHz license in the posture of an application to modify its

---

**2.** "A major change is any increase in power, or any *change in frequency*, hours of operation, or station location." 47 C.F.R. § 73.3571(a)(1) (emphasis added).

**3.** Any amendment proposing a "major change" results in the assignment of a new file number to the application, which returns it to the processing line for comparison with competing applicants. If other applications are already pending, as was the case here, the return to the processing line eliminates the application from the pending proceeding. *See* 47 C.F.R. § 73.3571(j)(1). This Land O'Lakes obviously did not want.

**4.** The Commission has interpreted the § 307(b) standard of "fair, efficient, and equitable distribution" to require that, when competing applications specify different communities of license, the community with the greatest need for radio service be given priority. Not surprisingly, the need for radio service is assessed primarily in light of the facilities presently available in the proposed communities and their relative population. *See, e.g., Radio Greenbriar, Inc.,* 80 F.C.C.2d 107, 109, *recon. denied,* 80 F.C.C.2d 140 (Rev.Bd.1980). The Commission generally presumes that the unserved community with the greatest population has the greatest need for a station. *See, e.g., Cornwall Broadcasting Corp.,* 89 F.C.C.2d 704 (Rev.Bd.1982). If one community's need for service is sufficiently greater than that of the others proposed, only applications specifying the former receive further consideration. *FCC v. Allentown Broadcasting Corp.,* 349 U.S. 358, 361–62, 75 S.Ct. 855, 858, 99 L.Ed. 1147 (1955). Thus, a community with no local transmission service obtains a decisive advantage over communities with existing stations.

original construction permit for the now-undesired 1510 kHz station. By virtue of that awkward status, Land O'Lakes found itself subject to a handicap imposed by section 307(b), as interpreted by the Commission in its decision in *Santee Cooper Broadcasting Co.*, 99 F.C.C.2d 781 (Rev. Bd.1984), *recon. denied,* 100 F.C.C.2d 469 (Rev.Bd.1985), *aff'd as modified on other grounds sub nom. Women's Broadcasting Coalition, Inc.*, 59 Rad.Reg.2d (P & F) 730 (1986), *aff'd* 812 F.2d 1443 (D.C.Cir.1987) (per curiam). In that case, the Commission held that an extant construction permit was cognizable as an *existing broadcast service* for section 307(b) attribution purposes. In conformity with *Santee Cooper's* holding, the ALJ concluded that Land O'Lakes' existing construction permit, which under applicable judicial precedent had not lapsed, *see MG–TV Broadcasting Co. v. FCC*, 408 F.2d 1257, 1261 (D.C.Cir.1968); *see infra* text at 185, required that Troy, Ohio, be attributed a station for purposes of section 307(b)'s comparative evaluation. *Land O'Lakes Broadcasting Corp.*, 103 F.C.C.2d 767, 781 (ALJ 1985), *aff'd in part and rev'd in part,* 103 F.C.C.2d 758 (Rev.Bd. 1986), *review denied,* F.C.C. 86–580 (Jan. 9, 1987). That is to say, under the attribution rules of section 307(b), Troy found itself with a "station," namely Land O'Lakes' unbuilt 1510 kHz AM station.

In so concluding, the ALJ looked askance at Land O'Lakes' procedural maneuvers designed to shift its target from 1510 to 1030 kHz:

> The sequence of events ... suggests that Land O'Lakes had by the end of 1982 no intention to construct a facility on 1510 kHz and hoped to exploit the fact by using it as a reason for converting its pending application for modification into an application for a new facility, thereby obtaining a more favored position for its 1030 application, it being generally accepted that a section 307(b) comparison between an application to improve facilities and one for a new station in a different community that has no local outlet tends to favor the latter.

*Id.* at 780; *see supra* note 4. This tack, the ALJ concluded, would not do. The judge condemned what he saw as Land O'Lakes' "attempt to convert its original proposal into an application for a new facility while retaining its comparative standing in this proceeding." *Land O'Lakes*, 103 F.C.C.2d at 780. Consequently, the ALJ awarded the construction permit to Union City.

Judge Conlin, the ALJ, did not have the last word, however, as the Commission's Review Board was of a different mind. In the Review Board's view, Land O'Lakes had no intention of constructing a station on its originally authorized 1510 frequency. Declining to blink at reality, the Review Board determined that it would not "presume" under the statute that Troy nonetheless enjoyed an existing station. "[T]he community of Troy," the Board asserted, "should suffer no Section 307(b) disadvantage by the attribution of a 'fictitious' local transmission service that does not and will not exist. Therefore, we credit the Land O'Lakes application as proposing a first local outlet for Troy." *Land O'Lakes Broadcasting Corp.*, 103 F.C.C.2d 758, 762 (Rev.Bd.1986), *review denied,* F.C.C. 86–580 (Jan. 9, 1987). In its analysis, the Review Board expressly distinguished the Commission's decision in *Santee Cooper* on the ground that that case embodied only a *presumption* that an existing construction permit would in fact ultimately result in actual service. Since Land O'Lakes had rebutted this presumption, the Review Board concluded, no attribution should be laid at Troy's feet. *Id.* at 762 n. 1.

In the course of its decision, the Review Board rejected Union City's argument that, even disregarding Land O'Lakes' construction permit for purposes of section 307(b), Troy was not in actual danger of being left in a stationless lurch. Union City had pointed to the FCC's then-recent allocation for a new FM channel to Troy and the filing of six applications for that new station. The Review Board was unimpressed with this outpouring of interest in Troy's radio future and invoked the literal words of *Santee Cooper* to fend off Union City's assault. In contrast to its non-literal, functional interpretation of *Santee Cooper* as to Land O'Lakes' extant construction per-

mit, the Review Board shifted to a literal reading as to this point, namely, that the mere existence of numerous applications for a duly allocated station was insufficient to satisfy *Santee Cooper*'s requirements. *Id.*

With the determination that no attribution should be made to Troy, the battle for the 1030 kHz allocation thereupon reduced to one between a small town, Union City, and a larger community, Troy, both of which (under the Board's analysis) were in want of an initial local transmission service. With the issue thus posed, the conclusion inexorably followed that Troy, whose population of 19,086 dwarfed Union City's modest population of 3,908, would win the allocation prize. "Under well established law, when evaluating the need for local transmission service, 'the Commission presumes that the most populous community has the greatest need ... provided that it has commensurately greater civic, cultural, religious, social, and commercial attributes.'" *Id.* at 765 (quoting *Ruarch Associates,* 99 F.C.C.2d 338, 341 (Rev.Bd.1984), *aff'd,* 101 F.C.C.2d 1358 (1985)). Troy fully satisfied *Ruarch*'s requirements and thus Land O'Lakes was awarded the 1030 kHz allocation.

## II

We have set forth at some length the respective analyses of the ALJ and Review Board because they pose in sharp relief the sole question necessary for resolution of this appeal: whether the Commission (and its Review Board) erred in not attributing to Troy the station for which Land O'Lakes had the never-forfeited construction permit.

One preliminary point is in order. It is beyond dispute that, under settled precedent, Land O'Lakes' construction permit for the 1510 kHz allocation continued to have legal efficacy, notwithstanding the applicant's attempted abandonment of the permit. Curious though it may be, under settled law (at least as FCC regulations currently stand) a construction permit continues unabated until the Commission itself declares the permit forfeited. *MG–TV*

*Broadcasting Co., supra,* 408 F.2d 1257; *Mass Communicators, Inc. v. FCC,* 266 F.2d 681 (D.C.Cir.), *cert. denied,* 361 U.S. 828, 80 S.Ct. 76, 4 L.Ed.2d 71 (1959). Here, of course, no such order of forfeiture was ever entered. There was, instead, only the post-"A" cutoff request of Land O'Lakes (in December 1982) that its July 1982 request for a modification of its construction permit (for the 1510 kHz license) be transformed into and treated as an application for a new station (the 1030 kHz license). But the reader will recall that Land O'Lakes expressly made that request *contingent* upon the application's not being treated as a "major change" so as to require Land O'Lakes, in effect, to abandon the field to its competitors (like Union City) which had recently entered the picture. It will also be recalled that the Mass Media Bureau returned the December 1982 application, albeit at a snail's pace, in conformity with Land O'Lakes' request. That action had the necessary consequence of leaving before the Commission, pursuant to the Mass Media Bureau's designation order, only Land O'Lakes' July 1982 request to modify its existing construction permit.

It is with this fundamental procedural point in mind that we return, briefly, to the Commission's applicable precedent. As previously stated, the FCC's decision in *Santee Cooper* clearly held that *the issuance of a construction permit is the triggering event for purposes of section 307(b)'s attribution rules. Santee Cooper,* 99 F.C.C.2d at 785. *Santee Cooper* specifically considered other, alternative trigger points for attribution, including the allocation of a frequency to a community and the existence of duly filed applications for a construction permit. Relying upon the Commission's regulatory experience, the Review Board observed that in ninety-five percent of all cases the holders of construction permits, as opposed to mere applicants, in fact proceeded to build stations and institute service. *Id.*

A straightforward, plain-meaning reading of *Santee Cooper* was embraced by the ALJ in this proceeding. The Review Board, in contrast, read *Santee Cooper* in

two ways. After articulating a non-literal approach to the section 307(b) inquiry in respect to the tell-tale, never-forfeited construction permit, the Review Board in the next breath invoked *Santee Cooper*'s literal holding to parry Union City's thrust that FM service to Troy was clearly in the offing, whereas Union City was languishing with no prospect of local transmission service in sight. *Land O'Lakes*, 103 F.C.C.2d at 762 n. 1.

*Santee Cooper* holds that "[the Commission] will consistently apply the ... premise that, for comparative purposes, only granted construction permits will be reckoned" when conducting the section 307(b) comparative analysis. *Santee Cooper*, 99 F.C.C.2d at 785. Until overruled or qualified, the *Santee Cooper* precedent, in its current shape, binds the Commission. And, as the ALJ rightly concluded, *Santee Cooper* indicates that the continuing existence of Land O'Lakes' construction permit requires that the company suffer the unhappy consequences of a station's being attributed to Troy for purposes of section 307(b).[5]

That being so, Judge Conlin was correct in his analysis and the Commission's order to the contrary cannot stand. We refrain, however, from directing the reinstatement of the ALJ's decision. We do so for two reasons. First, the FCC might revisit its *Santee Cooper* precedent in view of the inconsistent readings accorded that decision by the Review Board. Second, at oral argument counsel for the Commission indicated that if there was found to be considerable disparity in population between Troy

and Union City this might bear on the Commission's final evaluation as to which community should be given the 1030 kHz allocation (notwithstanding the attribution of the 1510 kHz station to Troy).

It is, of course, not for us to embark on an expedition into these precincts without the benefit of the FCC's views, and Commission counsel has rightly refrained from suggesting that we do so. Instead, we reverse the Commission's order and remand the case to the FCC for further proceedings consistent with this opinion.

*It is so ordered.*

---

5. Commission counsel ably argues that the court should not read into *Santee Cooper* an irrebuttable presumption that the existence of a construction permit inexorably means, regardless of the actual circumstances at hand, that the community must be saddled with the bitter fruits of a rigid allocation doctrine. Fairly viewed, our analysis does not in fact reduce to such a Procrustean process. To the contrary, we read *Santee Cooper* as the Review Board did in its (literal) reading of that pivotal precedent with respect to the nonsignificance for attribution purposes of numerous contenders for the Troy FM license. We therefore find it unnecessary at this juncture to wade into the formidable thicket of the appropriateness of the Commis-

sion's considering Land O'Lakes jeremiad about its now-unwanted 1510 kHz allocation. Appellant contends that Land O'Lakes, inspired by the greener pastures of the 1030 kHz allocation, is crying crocodile tears; Land O'Lakes protests that this accusation is singularly unfair and avows the sincerity and rationality of its pledge to forsake the now-uneconomical spot on the dial. We have no occasion on this appeal to pass on any of these points, which have made for such skilled and hearty jousting among counsel. We are content, rather, to rely upon the time-honored requirement that the Commission faithfully abide by its own binding precedent.