STAR TELEVISION, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

COMMUNITY BROADCASTING, INC.,
Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

CITIZENS TELEVISION CORP.,
Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

FEDERAL BROADCASTING SYSTEM,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

HERITAGE RADIO AND TELEVISION
BROADCASTING CO., Inc., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

GENESEE VALLEY TELEVISION CO.,
Inc., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

MAIN BROADCAST CO., Inc., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

ROCHESTER TELECASTERS, INC.,
Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Flower City Television Corp., Intervenor.

Nos. 21277, 21541–21547.

United States Court of Appeals
District of Columbia Circuit.

Argued April 26, 1968.

Decided Jan. 30, 1969.

Petition for Rehearing Denied
April 1, 1969.

Certiorari Denied Oct. 27, 1969.
See 90 S.Ct. 171, 178.

Mr. Eugene F. Mullin, Jr., Washington, D. C., for appellant in No. 21546, and Mr. Benedict P. Cottone, Washington, D. C., for appellant in No. 21541, argued on behalf of all appellants. Messrs. J. Parker Connor and S. White Rhyne, Jr., Washington, D. C., also entered appearances for appellant in No. 21546. Mr. Peter Shuebruk, Washington, D. C., was on the brief for appellant in No. 21277. Mr. Howard Jay Braun, Washington, D. C., also entered an appearance for appellant in No. 21277. Messrs. Vincent B. Welch and Robert N. Green, Washington, D. C., were on the brief for appellant in No. 21542. Mr. George R. Douglas, Jr., Washington, D. C., was on the brief for appellant in No. 21543. Messrs. Arthur Scheiner and Gilbert B. Lessenco, Washington, D. C., were on the brief for appellant in No. 21544. Messrs. Edgar W. Holtz and G. Richard Dunnells, Washington, D. C., were on the brief for appellant in No. 21545. Messrs. Warren Woods and Everett D. Johnston, Washington, D. C., were on the brief for appellant in No. 21547. Mr. Jon F. Hollengreen, Washington, D. C., also entered an appearance for appellant in No. 21547.

Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, with whom Mr. Henry Geller, General Counsel, Mr. John H. Conlin, Associate General Counsel, and Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Harold David Cohen, with whom Messrs. Thomas N. Dowd, William S. Green, and J. Laurent Scharff, Washington, D. C., were on the brief, for intervenor.

Before PRETTYMAN, Senior Circuit Judge, and BURGER and LEVENTHAL, Circuit Judges.

PRETTYMAN, Senior Circuit Judge:

These are appeals from a decision and order of the Federal Communications Commission, in which the Commission awarded a construction permit for a television broadcast station on Channel 13 at Rochester, New York. There are eight appellants in as many appeals, consolidated. The appeals are from a Decision [1] and a Memorandum Opinion and Order [2] in which reconsideration was denied.

The case was enormously complicated and tedious. The channel was newly al-

1. Flower City Television Corp. et al., 9 F.C.C.2d 249 (1967).

2. 10 F.C.C.2d 718 (1967).

located to this location. Twelve applicants filed, and their applications were referred to an examiner for comparative hearing and decision. Her findings of fact in the consolidated proceeding were 253 finely printed pages in length. The applicant to which she recommended a grant (a combination of two applicants on a share-time basis) withdrew its application. Whereupon the Commission remanded, then withdrew the remand, held further oral arguments, rendered a decision in which it adopted the examiner's findings, made further findings, and rendered an award.

■ Appellants say the Commission failed to resolve all the issues raised by them, violated its policy statement in a number of respects, failed to give weight to certain derelictions or shortages of the successful grantee, ignored uncontradicted evidence, acted arbitrarily, did not apply the comparative criteria to all applicants—a total of sixteen points. They argue, *inter alia*, that, when the application of the initially successful grantee was withdrawn, the entire initial decision became meaningless and so the parties have been deprived of their right to have an examiner "pass upon their proposed findings and conclusions addressed to the factual situation as it actually exists." The last-stated contention is obviously untenable. Basic facts do not derive their characteristics from the conclusion one may draw from them. If the conclusion be changed, the underlying facts are not thereby changed. Even if the conclusion be withdrawn the facts remain facts, and if they were correctly found the findings remain unchanged. In addition to this consideration on the point made by appellants, we note there was a reargument of the case after the withdrawal of the initially successful applicants.

We think we need not discuss any of the other contentions, with one exception. The noteworthy phase of the dispute concerns principally the procedural requirements in a decision in a comparative case. The Commission had developed guidelines, which it called "criteria" and which it used for comparative measurement purposes. In the course of usage these criteria acquired names. Thus, some of them are Area Familiarity, Integration of Ownership and Management, Broadcast Experience, Diversification of Control of Mass Media, etc. In the midst of the present proceeding the Commission published a "policy statement", in which, with vigorous internal discussion and difference of opinion but with considerable flexibility in the result, it discussed some criteria at length, others summarily, and described the policies it intended to follow in making comparative decisions.[3]

■■ The reasoning of the Commission in the matter at bar may be a bit circuitous, but it is clear and amply supported by findings of fact and by the evidence. We pointed out in Johnston Broadcasting Co. v. FCC[4] the decisional process to be followed in disputes of fact. We said there should first be findings of basic facts, based directly on evidence; then there should be findings of ultimate facts, which are drawn from the basic facts; and then a conclusion should be given, based on the ultimate facts. In this concept of the process the basic facts should be drawn, at least initially, by the examiner, if there be one, since it is he who sees and hears the witnesses. In that opinion we said:

"(5) Findings must be made in respect to every difference, except those which are frivolous or wholly unsubstantial, between the applicants indicated by the evidence and advanced by one of the parties as effective. (6) The final conclusion must be upon a composite consideration of the findings as to the several differences, pro and con each applicant." [5]

3. Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965).

4. 85 U.S.App.D.C. 40, 175 F.2d 351 (1949).

5. *Id.* at 46, 175 F.2d at 357.

■ This latter clause did not mean, as appellants seem to contend, that the Commission must reach and state a comparison between each pair of applicants in respect to each criterion.[6] It meant findings in respect to each applicant as to every point of comparison suggested by a party, and then a composite consideration.

■ The Commission stated, clearly and emphatically, that it preferred Flower over all other applicants on the basis of broadcast experience. When a finding of preference "over all other applicants" is thus made, it is unnecessary to name separately each other applicant. In the case at bar a reading of the findings respecting the broadcasting experience of the several people scheduled to be in the management of each of the applicants shows clearly the reason for the preference of Flower on the point. The Commission, with all the facts before it in detailed findings, exercised a judgment which it was empowered to make. The basis for the choice is clear in the basic findings.

■ For the reasons which it stated, the Commission gave each of the other applicants otherwise associated with the media of mass communication a substantial preference over Federal on that criterion (Diversification of Control of Media of Mass Communication). In respect to Participation in Station Operation by Owners (Integration of Ownership and Management), Federal was substantially preferred over the other applicants, and among the other applicants Flower was ranked highest on this point. The Commission found no preference in respect to Proposed Program Service. In respect to the criterion Past Broadcast Service (the operation of broadcast stations in which the present applicants' principals held an ownership interest),

three applicants presented evidence. The Commission gave a preference to one (Community) on this point and denied any to the other two. The Commission awarded a demerit to one applicant on account of a character deficiency of one of its officers. Upon the basis of the preferences thus awarded, and the demerit, the Commission had remaining for final comparison three applicants—Federal, Flower and Community. It preferred Flower to Federal because of the latter's existing radio stations. It preferred Flower to Community because of Flower's superiority in participation in station operation (*i. e.*, integration of ownership and management.) It found this superiority not because the owners of Flower planned a greater amount of participation in its management but because they were much more and better experienced than were the owner-managers of Community. A reading of the detailed findings concerning the experience of each of the people involved shows clearly the grounds upon which the Commission made this finding.[7] We must keep in mind that we are not choosing a grantee. Our function has been described many times: We must understand the processes pursued by the Commission and test the validity of both the process and the conclusion.

We find no fault necessitating reversal. Affirmed.

LEVENTHAL, Circuit Judge (dissenting):

In view of all the time that has elapsed and paper that has been lodged, it is with some diffidence that I demur from this court's affirmance of the award by the Federal Communications Commission to Flower City Television Corporation (Flower) of the license for TV Channel 13, Rochester, New York. But I think

6. Such a task would be burdensome to the point of the ridiculous in some cases, as in the present one. To compare each of eight applicants with each other applicant in respect to each of eight criteria would require 224 comparisons, according to our combinatorial analysis.

7. The findings as to the personnel of Flower involved in this problem will be found in the *Flower City Television* decision, *supra* note 1, at 269, those of Community at 295, and those of Citizens at 322.

the findings fail to support the order, in that the Commission failed to set forth its reasons for preferring Flower to Community Broadcasting Company (Community) and Citizens Broadcasting Company (Citizens). In my view sound principles of administrative law and judicial review require remand to the Commission.

I

It was in August 1961 that Channel 13, a VHF channel, was assigned to the area of Rochester, New York, sometimes called the Flower City. After applications to operate the channel were duly filed, a comparative hearing began in June 1962. It ended in December 1962. In January 1964 the Hearing Examiner filed an Initial Decision which included extensive findings. Without commenting on the qualifications of each applicant, except to note them, the Examiner, persuaded by the advantage of establishing an educational broadcast service in the area, decided upon an award to Rochester Area Educational Television Association, Inc. (RAETA) and Rochester Telecasters, Inc.[1]

On the basis of exceptions from other applicants, and an objection filed in amicus form by ABC, the Commission in May 1965 entered an order that reopened the record to explore, *inter alia,* the impact of a possible grant to RAETA on the objective of a competitive third network service.[2] At the same time each applicant was given the opportunity of bringing its application up to date to reflect involuntary changes and programming changes occasioned by changed needs of the community. The applicants entered into a series of negotiations, culminating in RAETA's withdrawal of its application.[3]

Meanwhile, on July 28, 1965, the FCC issued its Policy Statement on Comparative Broadcast Hearings.[4] On the withdrawal of RAETA the Commission determined that the instant proceeding could be decided on the basis of the record before the Examiner without further evidentiary submission and it vacated the remand. A second oral argument was held before the Commission on May 22, 1967, affording the parties another opportunity to focus on the relevant points in the record. The parties did not object to this procedure.

In making the award to Flower on August 3, 1967, five years after the hearing, the Commission adopted the Examiner's findings of fact but said that in view of RAETA's withdrawal "it is apparent that the findings in this proceeding now warrant substantially different conclusions and a different ultimate result."[5]

The Commission's opinion undertook to apply the criteria of its 1965 Policy Statement which set forth the criteria governing comparative hearings in regard to all future licensing orders.[6] Under three of the categories of criteria the Commission found explicitly that as between Flower, Community, and Citizens, none of them should be ranked preferentially. In connection with Past

1. These two applicants had proposed a share-time operation of channel 13 and their applications were treated as a single proposal. RAETA was to use the channel as a non-commercial educational station, and RTI was to use the balance of the time as a commercial ABC network affiliate.

2. Memoranda Opinions and Order, FCC 65-403, released May 13, 1965.

3. RAETA now operates Station WXXI in Rochester, a UHF educational channel.

4. 1 F.C.C.2d 393 (1965).

5. *Decision,* August 3, 1967, Application of Flower City Television Corp., FCC 67–924, 9 F.C.C.2d 249, at 252. Reconsideration was denied by Memorandum Opinion and Order, 10 F.C.C.2d 718 (Nov. 22, 1967). Commissioner Bartley and Commissioner Johnson dissented separately.

6. The categories are: Diversification and Control of Media of Mass Communications; Full-Time Participation in Station Operation by Owners; Proposed Program Service; Past Broadcast Record; Efficient Use of Frequency; Character; Other Criteria.

Broadcast Record Community was singled out for preference because of its "commendable record." In the area of Participation in Station Operation by Owners, Flower was ranked second after Federal. Flower's relatively high ranking here turned out to be crucial. The Commission concluded that the award should go to Flower despite Community's edge in Past Broadcast Record.

While the record suffices to show that Flower seems to be a satisfactory licensee, I think a remand is required because the Commission has failed adequately to justify its preference for the experience of Flower's participating owners, as opposed to that of the principals of Citizens and Community.

## II

This court has consistently insisted on adequate findings and explanation in support of administrative decisions. In a careful opinion the court set forth the relevant criteria, with specific reference to the requirements for findings issued after comparative hearings:[7]

(1) The bases or reasons for final conclusions must be clearly stated.

(2) That conclusion must be a rational result from the findings of ultimate facts, and those findings must be sufficient in number and substance to support the conclusion. (3) The ultimate facts as found must appear as rational inferences from the findings of basic fact. (4) The findings of the basic facts must be supported by substantial evidence. (5) Findings must be made in respect to every difference except those which are frivolous or wholly unsubstantial, between the applicants indicated by the evidence and advanced by one of the parties as effective. (6) The final conclusion must be upon a composite consideration of the findings as to the several differences, pro and con each applicant.

The Commission's findings do set forth the bare bones facts of the nature and extent of the broadcast experience of the principals involved.[8] What is lacking is the critical feature of justification or analysis explaining why the Commission deemed the background of Flower's executives to be preferable.

I do not for a moment suggest that the Commission must dot every "i" and

7. Johnston Broadcasting Co. v. FCC, 85 U.S.App.D.C. 40, 46, 175 F.2d 351, 357 (1949).

8. These findings, set forth in the Examiner's findings of fact, and adopted by the Commission may be summarized as follows:

FLOWER 9 F.C.C.2d at 268–69.
Larson: 1926—announcer and program director at Salt Lake City radio station; 1929—producer-director for NBC radio network in New York; 1934—independent radio producer; 1942—20% owner and general manager of District of Columbia radio station; 1945—vice president and general manager for radio and television operations of the Philadelphia Bulletin; supervised application for and construction of Philadelphia TV station while television operations supervisor for Philadelphia Bulletin; 1953–1959—President, general manager, and 20% owner of Salt Lake City radio-TV station.
Auchincloss: 1934 (at age 17)—summer job as announcer for Asbury Park radio station. Since 1943, he has been

an independent writer, director, and producer in radio, television, and other fields.
CITIZENS 9 F.C.C.2d at 322–25.
Fay: 1927—studio manager at Buffalo radio station; 1928–1957—general manager and officer of Rochester radio-TV station (TV since 1949).
Fraiberg: 1949—sales manager and programming for San Francisco TV station; 1959—assistant to vice president in charge of television, Metropolitan Broadcasting Co. (Metromedia); 1963 —general manager of District of Columbia television station (now manager of WNEW-TV in New York).
COMMUNITY 9 F.C.C.2d at 295–301.
Greene: 1934—account executive of Buffalo radio stations; 1946—national sales manager for Buffalo radio station; 1953—assistant general manager of Buffalo radio station; co-owner of radio stations in North Carolina and Colorado; 1956—co-owner and general manager of Rochester radio station.
Hanna: 1940–present—general manager of Cornell University AM-FM radio station.

cross every "t" in its conclusions. It is enough if a court can "discern the path" followed by the Commission.[9] And I *can* discern the path by which the Commission disposed of the applicants other than Citizens and Community. The Commission's reasons for rejecting Federal, Genesee and Heritage on grounds other than broadcast experience were amply stated, based on considerations that were within the purview of the Policy Statement, and supported by the record. As to Star, Main and RTI, the Examiner's basic findings make it reasonably clear to me that these applicants were substantially deficient in television broadcast experience as compared with Flower, Citizens or Community.

Agencies should not be compelled to labor the obvious.[10] Certainly the Commission is not required to formulate a comparison between each pair of applicants for each criterion. A certain summariness of treatment is acceptable and necessary for relatively insubstantial matters. I do not quarrel with Judge Prettyman's observation in that context.

When we come to the issue of prior broadcast experience, however, we are manifestly concerned with a critical aspect of the hearing and decisional process, and the Commission cannot rely on bare conclusions without supporting findings unless the existence and content of those findings are virtually manifest.

Flower was rated superior in "participation in station operation by owners" to all applicants other than Federal (which was downgraded on the diversification criterion). What was the basis of that preferential rating? To borrow Commissioner Bartley's words, the Commission's decision virtually admits that "the fact that most of the Flower stock is held by persons with area familiarity and by persons who will devote some time

to the operation of the station is also true of most of the other applicants."[11] The majority of this court accordingly projects that Flower's preference on this criterion rests not on a greater amount of owner participation in management, but on the fact that Flower's owner-managers were much more and better experienced than those of the other applicants.

Let us begin by comparing Flower and Citizens—reserving discussion of Community because that involves still another serious problem with the findings. All the Commission says is: "Among the other parties with substantial integration, Flower ranks the highest, in view of the broad broadcasting, and particularly television, experience of G. Bennett Larson, and of the somewhat lesser experience of Gordon Auchincloss II."[12]

If the Commission had stated why it preferred Flower's principals to Citizens' in regard to experience, I might be able to say—yes, those reasons are supported by the record and they seem reasonable. But in the absence of such comparative findings by the Commission, the Commission's reasons for preferring Flower are neither obvious nor "discernible" so far as I am concerned, even after attentive study of the evidentiary findings.

The evidentiary findings do show that Flower's principals had extensive broadcast experience. Flower's proposed general manager, Larson, had started in radio in 1926 and had remained in the commercial communications field until 1958. His most recent experience had been as president, stockholder, and general manager of a Salt Lake City radio and television station. The proposed program director, Auchincloss, had been a writer, director, and producer in television, radio and other fields since 1943.

9. *See* Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

10. See my dissent in MG-TV Broadcasting Co. v. FCC, 133 U.S.App.D.C. 54, 408 F.2d 1257, Dec. 20, 1968.

11. 9 F.C.C.2d at 261.

12. 9 F.C.C.2d at 254.

However, the principals of Citizens likewise had extensive television broadcast experience on which the Commission failed to comment. Fay began in radio in 1927 and had been continually engaged as an officer and general manager of a *Rochester* radio and television station until 1957. Fraiberg began his television career in 1949, had been general manager of two television stations, and was still employed as a general manager when the Commission made its award. It is significant, moreover, that his experience embraced management of a TV station in a large metropolis.

It is possible that, for reasons undiscernible by me, the Commission could reasonably have concluded, *e. g.*, that Larson's background as a producer is more significant than Fraiberg's executive experience (though *a priori* I would have supposed exactly the reverse), or that Larson and Auchincloss make a better "team" than Fraiberg and Fay, or have associations of better quality. Any such conclusion with supporting evidentiary findings might have been an acceptable ground for decision. But the Commission put forth only a peremptory conclusion which, in my view, was not adequately supported.

Turning now to Community, there is applicable here, *pari passu*, all that I have noted in discussion of Citizens with regard to the gaps in the findings, and the lack of reasoned judgment and analysis as to comparative experience of Messrs. Greene and Hanna.

But there is more, for Community was entitled to a credit for its past broadcast record. The significance of this is heightened by the Commission's determination, in line with the express comment in the Policy Statement, that no such credit is available for average performance, a standard that led to the denial of a preference to Star or Federal on this point. What is required is "such an unusual degree of attention to the public's needs and interests as to establish an unusually good past broadcast record." (9 F.C.C. 2d at 255). Community met this test. The Commission said: "Community has made a showing concerning the broadcast record of station WHAM during the period its 15 percent stockholder, F. Robert Greene, was 50 percent owner and general manager of that station." And after recounting some aspects of that station's outstanding performance the Commission said: "In view of the facts that Greene was general manager and an owner of WHAM during this period and that Greene proposes to be in an active full-time supervisory capacity in Community's proposed station, we are convinced that Community must be given credit for the commendable record of performance compiled by WHAM while Greene was associated with it." (9 F.C.C.2d at 253).

Because of this factor, Commissioner Johnson would have given the award to Community. That is of course not decisive. But it suggests that more was required than was provided by the Commission when it summarily said: "We prefer Flower to Community because of Flower's superiority in the area of participation in station operation. This superiority arises from the experience factor." (9 F.C.C.2d at 256).[13] When executives responsible for an outstanding past broadcast record are given a relatively low rating on ground of comparative broadcast experience, there would seem to be a situation which may

---

13. The Commission also said (pp. 256–257): "(We note that Community's participating stockholders also lack area familiarity)." The use of parentheses reinforces the text in indicating this was a make-weight. The evidentiary findings make clear that while Flower has stockholders familiar with the Rochester area, none of them plan full-time participation in station affairs. In the Policy Statement the Commission said that only a "slight credit" would be given for local residence of persons with ownership interests who will devote "some time" but "cannot be considered as actively participating in station affairs on a substantially full-time basis." (1 F.C.C.2d at 396).

possibly exist [14] but should not be asserted in the absence of reasoned comment and explanation. No such comparative comment was provided here.

There may be a clue to what the Commission had in mind in its concluding remark: "We feel that Community's past record, while commendable, has not been shown to be so outstanding as to warrant substantial weight, since the past record is not that of Community itself, but rather of a 15-percent stockholder (and proposed general manager) who was a 50-percent owner of the station whose record is involved." (9 F.C. C.2d at 257). This was reiterated on rehearing. (10 F.C.C.2d at 719).

This seems to be a distortion of a more meaningful admonition in the Policy Statement:

> If a past record warrants consideration, the particular reasons, if any, which may have accounted for that record will be examined to determine whether they will be present in the proposed operation. For example, an extraordinary record compiled while the owner fully participated in operation of the station will not be accorded full credit where the party does not propose similar participation in the operation of the new station for which he is applying.[15]

Is the Commission saying that a 15 percent interest in the TV station was insufficient incentive to bring forth the ability and acumen that resulted in the outstanding record of Greene's station? It should be noted that Larson's interest is only 10 percent, and Auchincloss's is only 8.33 percent. Whatever the rationale, if any, for discounting Community's past record, the court ought not have to grope for the policy the Commission sought to further. *See* Radio Station KFH Co. v. FCC, 101 U.S.App. D.C. 164, 247 F.2d 570 (1957).

### III

While a hearing examiner who has "lived with a case" [16] might have based a conclusion on the presence and acumen displayed by the various principals during the hearings, the Commission decided without the benefit of any pertinent examiner recommendation. I do not say the Commission necessarily erred in proceeding without further evidentiary hearings. However, its task was made more difficult by the lack of evidentiary findings of an examiner (or intermediate decision of a review board) purposefully addressed to the pending applicants. The Commission's obligation to provide findings meaningfully related to its result was enlarged accordingly.

I frankly put to myself this question, Should the courts continue to adhere to the approach of requiring the agency to develop a meaningful statement of reasons for a function like this, of choosing the best qualified among several competing applicants? Maybe an agency cannot meaningfully say more than why it screens out those applicants who fall by the wayside due to "demerits" in some prominent category, or who are plainly second best for some reason. Maybe all it can do as to the other applicants is say: These applicants are all reasonably qualified; we have no meaningful way of choosing on principle between them; all we can really do is speculate who will do the best job in the public interest; and our best possible hunch is X. I believe Justice Frankfurter has applied to the concept of administrative expertise the phrase of Justice Holmes [17] concerning intuition that outruns analysis.

---

14. *E.g.*, there may be newcomers whose experience will be taken into account in assessing participation by owners even though their prior activity "would not qualify as a past broadcast record, *i. e.*, where there was not ownership responsibility for a station's performance." *See* 1 F.C.C.2d at 396.

15. 1 F.C.C.2d at 398.

16. *See* Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

17. Chicago, Burlington & Quincy Ry. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 51 L.Ed. 636 (1907).

The possibility that an agency may come to the point of resting on intuition is all the greater when it is recalled that there are no doctrines of burden of proof such as are available for decision of court cases when the proof stands in equipoise.

I for one would be prepared to sustain an action presented with such candor, but pause in saying that, to note that such a candid disclaimer would perhaps crystallize other and more acceptable solutions. Perhaps the Commission could advise the two or three applicants who survive after the first winnowing that they are in a run-off and now have the opportunity to enlarge the record in a more focused way. Perhaps the parties could settle the case. Perhaps a lottery could be used, for luck is not an inadmissible means of deciding the undecidable, provided the ground rules are known in advance.[18]

But all that is by the way, or perhaps for another day. In the case before us the Commission did not throw up its hands, so to speak. It purported to act in terms of reason, and I at least do not feel that I know the reason. "The administrative process will best be vindicated by clarity in its exercise."[19] I have general faith, notwithstanding some previous observations, that the public interest is best served by insisting that those who hold the trust of public office discharge their function with a conscientious statement of reasons, at least in matters adjudicated upon formal submission in an adversary process. This promotes confidence that decisions are unbiased and not arbitrary.[20] The requirement of findings and explanations, which are intended to assure neutrality and rationality, is enshrined in the core of our administrative law and the Administrative Procedure Act.[21] It should not be eroded with lip service.

## IV

A final word on the role of the court in relation to the administrative process is here appropriate to place my dissent in perspective. I have already noted that a court should be sensitive to the demands on the time of busy administrators, that it is unrealistic to require or expect dotted "i's" and crossed "t's," that it is enough to be able to "discern" the "path" followed by the administrator even when a decision leaves something to be desired.[22]

Yet the judiciary must not abdicate its function of enforcing substantive and procedural requirements, what Professor Jaffe calls the "supervisory" function.[23] For the moment at least the Rochester public is being served in terms of serv-

18. For example, lot has been used for selection of bonds for redemption; designating location of candidates on an election ballot; designating which of the newly elected members of a body (e. g., D.C. School Board elected in 1968) shall have a 1-year and which a 3-year term. Examples could readily be multiplied. Judicial machinery makes deliberate use of chance in selection of representative juries.

19. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S.Ct. 845, 853, 85 L.Ed. 1271 (1941).

20. *Compare* J. Frank, "Law and the Modern Mind" (New York, 1963). The need to state reasons in opinions helps to eliminate irrelevant prejudice and arbitrary decisions, and may also force a trier of fact and law to grapple with unconscious preferences, and to articulate and place in perspective the preferences that shape his decisions.

21. *See* section 8 of the Administrative Procedure Act, 5 U.S.C. § 557 (Supp. III, 1968).

22. *See* Colorado Interstate Gas Co. v. FPC, *supra* note 9; MG-TV Broadcasting Co. v. FCC, *supra,* note 10 (dissenting opinion).

23. *See* Jaffe, "Judicial Control of Administrative Action" at 589 (1965): " * * * the effectiveness of judicial supervision should be judged not only in terms of the case which correction was administered, but in its effect on doctrine in the long run."

ice.[24] In the long run, the general public will benefit from attentive judicial insistence on the essentials of the administrative process. Insistence on articulated reasons helps assure that our agencies are selecting those licensees who will best serve the public, and in a broader sense, enables the public to repose confidence in the judgment of its decision-makers. I would remand for further consideration and findings.

24. At this time an interim sharing operation is in effect whereby the competing broadcast groups are jointly managing the station. While these enforced joint ventures often do not prosper because no one participant feels it has a long-term commitment to the success of the enterprise, in this instance the participants are working harmoniously and the effort is flourishing.